UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*********************************************

| | |
|---|---|
| Yankee Gas Services Company and | * |
| The Connecticut Light and Power Company | * |
| | *      CASE NO. 3:06-CV-01369 (MRK) |
| v. | * |
| | * |
| UGI Utilities, Inc. | * |
| | * |

*********************************************

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

NOW COME the Plaintiffs, Yankee Gas Services Company and The Connecticut Light and Power Company (the Plaintiffs), and propose the following findings of fact and rulings of law to be considered by this Court in the resolution of this matter. Plaintiffs reserve the right to supplement and amend these proposed findings at the conclusion of the evidence.

### Proposed Findings of Fact

### The Nature of Operational Control at a Manufactured Gas Plant

1.  Operational control, as it relates to manufactured gas plants (MGPs), refers to control over the processes, design and equipment of an MGP.[1] *See* Shifrin Testimony at 5-8.

2.  MGPs converted carbonaceous materials into gas and then purified that gas to make it available for sale. The purification steps resulted in generation of byproducts – tar, coke, ammonia, ash, and box media to name a few – some of which also were sold. MGPs are therefore essentially chemical factories consisting of "unit operations". *See* Shifrin Testimony at 6.

---

[1] Throughout these proposed findings of fact, Plaintiffs reference the testimony of their witnesses in support of each factual assertion. In turn, that supporting testimony often provides detailed cross-references to the exhibits in this case.

3.   Operational control extends to all aspects of an MGP's unit operations, including each step in the actual gas manufacturing process, the waste management, the design, construction, modification and demolition of equipment, and all the decisions and adjustments associated with MGP activity that result in gas production and necessitate waste handling.  These decisions are made based on a high level of skill and understanding regarding the operational needs of MGPs. *See* Shifrin Testimony at 6.

4.   Operational control permeates all levels of gas manufacturing activity and can even be accomplished off-site.  *See* Shifrin Testimony at 7.

5.   Operational control covers a spectrum, from control over minute aspects of the plant's operations (such as decisions regarding raw materials to be used and specifications of equipment and activities that created gas and tar) to general operational control (such as plant inspections, transferring personnel between MGP facilities, and implementing policies).  *See* Shifrin Testimony at 7.

6.   Operational control encompasses the critical decisions about the waste handling at an MGP, including the fate of waste at the site.  *See* Shifrin Testimony at 7.

7.   Operational control involves the integration of technical knowledge, chemistry and mechanics, as well as mastery of a wide array of complex specialized skills.  *See* Shifrin Testimony at 7.

8.   UGI was the technical leader in its field.  As such, it had the technical competence and superiority to dominate the MGPs in its "domain."  *See* Shifrin Testimony at 7.

9.   UGI used the term "domain" to describe itself.  *See* Macey Testimony at 9.

10. UGI designed and constructed many of the pieces of equipment used at the MGP sites at issue in this litigation (the "Connecticut MGP sites"). *See* Shifrin Testimony at 7 and related exhibits.

11. UGI trained the gas engineers who operated the plants and freely transferred them around its network of MGPs. *See* Shifrin Testimony at 7.

12. UGI inspected the equipment and directed changes. *See* Shifrin Testimony at 7.

13. UGI instituted policies and procedures the facilities were required to follow. *See* Shifrin Testimony at 7.

### The Basic Operations of Manufactured Gas Plants

14. MGPs were complex industrial plants and the operation of an MGP was a highly sophisticated and technical process. *See* Shifrin Testimony at 8; Exhibit 11.

15. MGPs made gas for lighting and heating from a combination of air, steam, coal, coke, and/or petroleum, depending on which of three basic processes was used:  coal gas, oil gas or carbureted water gas. *See* Shifrin Testimony at 9.

16. MGPs used petroleum (oil) and coal as feedstocks to manufacture carbureted and oil gas, and both tar and oil were generated as byproducts from all three gas manufacturing processes. *See* Shifrin Testimony at 9.

17. By-product tar and oil  are commonly referred to today as "non-aqueous phase liquids" or "NAPLs".   They were condensed from the gas as it cooled while passing through various gas conditioning and purification unit processes.  These unit processes were designed to remove impurities and byproducts from the gas prior to distribution. *See* Shifrin Testimony at 10.

18. MGP tars are almost always denser-than-water NAPLs or "DNAPLs". They range in specific gravity from 1.01 to 1.18. MGP oils are typically lighter-than-water NAPLs or "LNAPLs". They range in specific gravity from 0.8 to 0.9. *See* Shifrin Testimony at 10 and related exhibits. *See* Shifrin Testimony at 10 and related exhibits.

19. Individual MGPs often produced billions of cubic feet of gas during their operating lifetime. Therefore, a tremendous volume of oil and tar production could be expected, no matter which manufacturing process was used. *See* Shifrin Testimony at 10.

20. A portion of this oil and tar was released to the environment. Although published MGP NAPL loss rates are not available, NAPL loss rates typical for similar industries, like oil refineries, range from 0.1% to 3%. *See* Shifrin Testimony at 11 and related exhibits.

21. Environmental contamination, as it is understood today, occurred during gas manufacturing as a result of the various gas-conditioning operations, from various process train leaks and other losses (like those found in chemical plants) because of the complicated network of tanks and pipes. *See* Shifrin Testimony at 11; Exhibit 11.

22. Many of the byproducts of gas manufacturing had marketable value and were recovered for sale. Byproduct recovery was often an integral part of MGP economics. In this regard, MGPs were highly efficient operations compared to many other industries at the time. The great efforts made through the years of not only purifying the gas product but also of recovering byproducts led the MGP industry to be pioneers of waste minimization. *See* Shifrin Testimony at 11 and related exhibits.

23. The byproducts of manufactured gas included wastewaters, carbonaceous liquids and solids (like tars, oils, and soot), solids impregnated with sulfur and cyanide compounds (called

"purifier" wastes), ash, clinker (which is fused ash), and, in some cases, coke. *See* Shifrin Testimony at 12.

24. Wastewaters from coal gas plants, resulting primarily from scrubbing the freshly made gas with water (in other words, contacting the gas with water), contained dissolved constituents such as ammonia, phenol (tar acids), tar bases, and also contained tar/oil droplets. *See* Shifrin Testimony at 12.

25. This wastewater most often was largely recycled to the washbox or to scrubbers, although small fractions were also discharged to the environment, generally after treatment. The carbonaceous liquids were often collected and purified as separate streams. *See* Shifrin Testimony at 12.

26. Tar was typically either refined into various products or used as boiler fuel. Sometimes the tar and oil formed emulsions with water, primarily in CWG plants and integrated plants. Tar passed through many pieces of equipment and was stored in tar tanks, gas holder tank "bottoms", and other tar vessels (*e.g.*, "tar wells"). These pieces of equipment were known for leakage and over flows. Because of this, these holder bottoms and tar vessels were often key sources of contamination at MGP sites. *See* Shifrin Testimony at 12.

27. Ash and clinker were relatively inert waste materials that found many local uses as fill and surface coverings for walks and driveways. Coke was used or sold as fuel – the ideal "smokeless coal." Purifier wastes were recycled to a point and then applied to other uses, such as for roadbeds and animal bedding, buried, or sold to recyclers. *See* Shifrin Testimony at 12.

28. The general goal of most MGPs was to recover as much tar as possible because the tar could be sold. However, tar was not always recovered and sometimes it was released into the surrounding environment. *See* Shifrin Testimony at 12; Exhibit 11.

29. Environmental contamination from MGPs which persists today is most often from byproduct releases in the form of both tar and oil. *See* Shifrin Testimony at 13.

30. After release to the environment, these materials persist for decades or even centuries. *See* Shifrin Testimony at 13 and related exhibits.

### Carbureted Water Gas Production

31. UGI played a key role in the establishment of carbureted water gas (CWG) as a prominent process for the manufacture of gas in the eastern half of the United States. *See* Shifrin Testimony at 14.

32. UGI was formed specifically in order to exploit Thaddeus S.C. Lowe's 1872 invention of the CWG process, which produced gas with more illuminating power and at less cost than coal gas processes. *See* Shifrin Testimony at 14.

33. The CWG process stream utilized numerous key unit processes, including the generator, carburetor, superheater, washbox: relief holder, scrubber, condenser, exhauster, tar extractor, final scrubber, purifier and distribution. *See* Shifrin Testimony at 15-17.

34. Tar and oil could enter the environment from losses during many of these processes. *See* Shifrin Testimony at 13; Exhibit 11.

35. Feedstock variations included mixing the coke with coal or tar and the use of different distillates of oil for the carburetion, ranging from naphtha and light "gas oil" (low-boiling distillate of petroleum) through top crude and Bunker "C" residual fuel oil (high-boiling distillate of petroleum). *See* Shifrin Testimony at 15.

36. These feedstock variations, along with operating temperatures on the order of 1,400°F, strongly influenced the amount, type, and composition of products and byproducts formed. *See* Shifrin Testimony at 15.

## Byproducts Production and Recovery at MGPs

37. The generation, management, and sale of byproducts was an integral issue in the operation of MGPs.  *See* Shifrin Testimony at 17.

38. Tar was the most important of these byproducts.  It was once referred to as "black gold."  *See* Shifrin Testimony at 17.

39. CWG plants typically produced from 0.2 to 1 gallon per 1,000 cubic feet of tar, depending on certain variables.  *See* Shifrin Testimony at 19 and related exhibits.

40. The volume of tar produced at most plants was enormous; millions of gallons were typically produced, handled, and stored.  *See* Shifrin Testimony at 17.

41. As a result, MGPs went to great efforts to recover this valuable byproduct for sale and for internal use as fuel or even gas feedstock.  *See* Shifrin Testimony at 17.

42. Operators were trained to operate tar recovery equipment, and technical conferences on MGPs, including UGI's annual Superintendent's Conference, commonly included the topic of tar recovery.  *See* Shifrin Testimony at 17.

43. The major uses of MGP tars were for fuel, roofing, wood treating, road surfacing, dyes, medicines, disinfectants, explosives, and specific chemicals such as benzene or naphthalene.  Tar was recycled into the water gas generator.  Road surfacing with tar was widely practiced in the U.S. and England, and it was also used to suppress dust on dirt roads and seal cracks in asphalt pavement.  Pitch was also used to form a more solid pavement material similar to today's asphalt pavement.  Tar or tar products were also used to coat drinking water mains, inside and out, for corrosion prevention, to protect the steel pipes in a hydroelectric dam, and to coat animal drinking water troughs, seed corn, and fishing nets.  *See* Shifrin Testimony at 22 and related exhibits.

44. Coal tar is still used today to coat some water mains, in driveway sealer, and in some pharmaceutical products including dandruff shampoos. Tar was the primary source of carbon for the synthetic chemicals industry, much as petroleum serves that purpose today. *See* Shifrin Testimony at 22.

45. MGPs had many different types of equipment aimed specifically at removing and recovering byproducts from gas including condensers, scrubbers, tar separators, tar extractors, purifiers, storage containers, and conveyance devices. It was also well recognized that gas holders accumulated tar in their fluid-holding bottoms. *See* Shifrin Testimony at 18.

46. All of this equipment required skilled operation and plant operators were specifically trained to run them. The equipment was routinely inspected, sometimes every day or week, and sometimes periodically, depending on their nature. *See* Shifrin Testimony at 18.

47. MGPs were essentially complicated chemical plants which moved, treated, and stored numerous fluids. These chemical plants and their appurtenances broke down occasionally, thus causing leaks, spills, or unplanned discharges of materials, including tars and oils into the ground or nearby streams. MGP repair records at plants throughout the nation document replacement of leaking equipment. *See* Shifrin Testimony at 19.

48. To be available for markets, tar first had to be separated and collected within the MGP and then refined, depending on the desired product. All MGPs had facilities for separating tar and some had their own refining capabilities. In addition, an extensive supporting industry of independent tar distillers existed to refine MGP industry byproducts. *See* Shifrin Testimony at 23 and related exhibits.

### UGI Formation, Acquisition and Methods of Controlling Its MGPs

49. Today, UGI Utilities, Inc. is a subsidiary of the public holding company UGI Corporation.  UGI Utilities distributes electricity and gas to customers in Pennsylvania.  Other UGI operations include energy marketing in the mid-Atlantic region, propane sales in Asia and Europe, electricity generation, and energy services.  *See* Macey Testimony at 7-8 and related exhibits.

50. UGI is the oldest public-utility holding company in the gas services field in the United States.  *See* Macey Testimony at 8 and related exhibits.

51. UGI was founded on June 1, 1882.  UGI was formed to exploit a revolutionary gas manufacturing process, the carbureted water gas process.  *See* Shifrin Testimony at 29 and related exhibits; Blake Testimony at 6.

52. T.S.C. Lowe patented the process in 1872 and 1875.  UGI obtained the patent from Lowe.  Lowe granted UGI exclusive right to "sell, manufacture and install the Lowe process throughout the United States" in agreements dated 1882 and 1885.  *See* Shifrin Testimony at 29 and related exhibits; Blake Testimony at 6; Macey Testimony at 8

53. Lowe teamed with other businessmen and investors to create a company (UGI) which could maximize the potential of his new invention.  As reported in *The UGI Corporation, The First 100 Years*, a book published by UGI about its history, not only did UGI "manufacture, sell and install Lowe process equipment," it also "leased existing gas works (that is, production and distribution facilities), installed Lowe equipment, operated the plants and profited from the sale of gas."  *See* Blake Testimony at 6 and related exhibits.

54. At the time UGI was incorporated and began taking control of local gas companies, Pennsylvania law did not allow corporations to hold the securities of other corporations.  To

avoid this law, UGI placed the shares of the companies it acquired in the hands of a proxy known as a "trustee." This proxy would nominally own the shares, although the real owner was UGI. The proxy acted pursuant to UGI's direction and control. *See* Macey Testimony at 9.

55. Later, to simplify this cumbersome process, UGI's founders acquired the charter of the Union Company. *See* Macey Testimony at 9 and related exhibits; Blake Testimony at 6.

56. Formerly known as the Union Contract Company, the Union Company had been granted a charter in 1870 by a special act of the Pennsylvania legislature and was thereby allowed to purchase and own the securities of other corporations. The name of the Union Company was changed to The United Gas Improvement Company in 1888, and, the following year, the new company acquired the assets of the old United Gas Improvement Company. *See* Macey Testimony at 9-10 and related exhibits.

57. The Union Company Charter allowed UGI to "enlarge the field of its operations, and, instead of merely building and installing water gas apparatus, as originally contemplated, to secure control of and operate gas properties in various parts of the country." *See* Shifrin Testimony at 29-30 and related exhibits; Blake Testimony at 6-7.

58. A UGI memo written in 1900 by Vice President and General Manager S. T. Bodine confirmed that after acquiring the Union Company's charter in 1888, "the management of the company [UGI] was able to enlarge the field of its operations, and, instead of merely building and installing water gas apparatus, as originally contemplated, to secure control of and operate gas properties in various parts of the country at points presenting attractive opportunities" (emphasis added). *See* Blake Testimony at 6-7 and related exhibits.

59. UGI has not produced any evidence that demonstrates that the "new" company, The United Gas Improvement Company, assumed anything less than all of United Gas Improvement Company's assets and liabilities.  *See* Macey Testimony at 10.

60. Because CERCLA was not enacted until 1980, The United Gas Improvement Company could not have carved out CERCLA liability in its acquisition because the CERCLA statute creating such liability had not even been contemplated.  *See* Macey Testimony at 10.

61. Rather than sell the CWG process to local utilities, UGI developed a strategy of acquiring those utilities and directing them to install the new equipment: "U.G.I. leased, and later, bought control of gas companies throughout the country in order to install the Lowe process."  *See* Shifrin Testimony at 30 and related exhibits.

62. UGI's corporate strategy was to acquire and control smaller gas companies in order to implement its new technology for making gas.  UGI's goal in making these acquisitions was to generate demand for the Lowe process.  To do this, UGI had to acquire operational control of the local gas plant in order to be able to control the decisions made by these local companies about what process to use to manufacture gas.  *See* Macey Testimony at 9 and related exhibits.

63. At the same time, UGI wanted to create the appearance that the local gas companies it owned and controlled were still independently owned and operated.  UGI attempted to mask its efforts to gain operational control of local gas companies, and to create the false impression that such companies were locally operated and had ownership independent of UGI. *See* Macey Testimony at 9.

64. UGI also attempted to mask its control over local gas companies because government officials and the public disapproved of local utilities coming under the control of huge national corporations.  For example, in 1900, after UGI gained control of the Norwalk manufactured gas

plant, an article in the local paper, <u>The Evening Hour</u> wrote stories under the headlines "Gobbled by Trust" and "Gigantic Octopus Still Spreading." *See* Macey Testimony at 10 and related exhibits.

65. A month later <u>The Evening Hour</u> reported that Mr. Smith, the President of the Norwalk company, "found that his little lighting and power company, ambitious to own merely one state, has passed to the control of men (UGI senior officials) who plan, some day, to own the earth." *See* Macey Testimony at 10 and related exhibits.

66. By the early 1900s, UGI had grown substantially and had interests in over 40 companies. *See* Blake Testimony at 7 and related exhibits.

67. UGI created and cornered a captive CWG market, selling ~1,200 water gas sets, with 1.5 billion cubic feet of daily capacity, worth $18 million: "There is hardly a gas plant in the United States that does not use a gas manufacturing set based upon the Lowe patents." *See* Shifrin Testimony at 30 and related exhibits.

68. UGI stated its goal was to acquire and *operate* MGPs:

"from the beginning it [UGI] undertook the operation of gas properties, either by ownership or lease of the gas companies located in different parts of the country...conducted vigorously and successfully by the Company throughout its life."

"U.G.I. gradually changed from a company primarily instrumental in the development of the technical arts of the gas and electric industries, to the ownership and operation of properties of this type."

*See* Shifrin Testimony at 30 and related exhibits.

69. According to UGI, "in the old days of small units," UGI controlled its subsidiaries "through the local personal supervision of one or two men." The isolated companies were gradually brought into large groups through various holding and sub-holding companies, such as The Connecticut Light & Power Company. *See* Shifrin Testimony at 30 and related exhibits.

70. The *Daily Philadelphia Stockholder* published an article on April 9, 1894, which provided a general overview of UGI's methods of growth and controlling its subsidiary gas manufacturing plants:

> With such a charter the management of the company [UGI] decided to enlarge the field of its operations, and, instead of merely building and installing water gas apparatus, as originally contemplated, to secure control of and operate gas companies in various parts of the country at points presenting attractive opportunities. . . .
>
> On the ground directing the operations of each local company is a superintendent acting under the instructions of the general superintendent stationed in this city [Philadelphia]. The local superintendents are thus kept in close touch with the home office, and they take no important step which is not specifically authorized. While their instructions are to purchase in the city where each plant is located all needful supplies obtainable there, and thus give to each city the benefit of outlays in part incidental with the carrying on of the business, supplies, such as coal, oil, cast iron pipe, etc., are purchased through the home office, in order that here in the East the company may secure the benefit of minimum prices. Attached to the company is a corps of traveling auditors, one of whom visits each local company every three months and makes an examination of its operations and reports thereon to the home office. The system of the company is admirable. Not a dollar is outlayed for its account at any point or for any purpose which is not first approved at the home office, and there is the closest scrutiny into each item of expense. . .
>
> Annually there is a convention of superintendents of the local companies, president over by the general superintendent, at which, besides reports of each as to the operations of the plant or plants under his control, papers are read on practical subjects relating to the objects of the company, etc. The reports are valuable in shaping the management of the company, and are usually of a high order. A gentleman present at one of these conventions – a gentleman who, it may be said in passing, is himself a noted authority on such subjects – stated to a representative of *The Stockholder* that the papers read were of more importance in a practical way than any he had heard at more ambitious gatherings.

*See* Blake Testimony at 8 and related exhibits.

71. UGI's method of acquiring control of local gas plants was also described in the 1896 *Daily Philadelphia Stockholder* article:

> A town or city of moderate size, with a steadily growing population, and giving evidence of thrift and prosperity, may have no gas supply, or it may have an inefficient or unprofitable plant. Either situation gives The United Gas Improvement Company its opportunity. A local company is organized in which the parent corporation secures just sufficient stock to exercise control. This promotes local interest in the enterprise, and insures close supervision of its

13

operations by interested parties right on the ground. **The United Gas Improvement Company then installs its improved system, and places in charge a superintending engineer in its own employment, who reports to the general superintendent in Philadelphia.  The local operation is thus kept in close touch with the home office and at all times under the complete control of the home management**.

\* \* \* \*

On the ground directing the operations of each local company is **a superintendent acting under the instructions of the general superintendent stationed in [Philadelphia].**  The local superintendents are thus kept in close touch with the home office, and **they take no important step which is not specifically authorized.**

\* \* \*

The system is admirable.  Not a dollar is outlayed for its account at any point or for any purpose **which is not first approved at the home office**, and there is the closest scrutiny into each expense.

*See* Shifrin Testimony at 31 and related exhibits; Blake Testimony at 9-10 and related exhibits.

72. UGI produced these documents to the Plaintiffs' counsel in a related case.  UGI paid for a subscription to the *Daily Philadelphia Stockholder* and UGI paid for an article to be published in a 1904 edition.  *See* Blake Testimony at 9 and related exhibits.

73. These historical documents were publications that were commercially prepared in connection with the promotion of stock offerings and secondary stock market trading in order to promote investor interest in trading, investing in and following the securities of the issuing companies on the stock exchange. As a practical matter, these documents were generally prepared in close cooperation with the issuer and often were actually prepared by the issuers themselves or, at a minimum, with significant issuer input.  *See* Macey Testimony at 10-11.

74. These contemporaneous external descriptions of UGI's methods of acquisition and operational control are consistent with UGI's own descriptions of its management and operating control through the actions of its Managing, Executive, and Management Committees and other UGI operational and local gas plant management practices.  *See* Blake Testimony at 10.

14

75. These contemporaneous external descriptions also explain UGI's strategy of acquiring sufficient stock to "exercise control" of the local company, but less than 100% of the local company's stock.  *See* Blake Testimony at 9-10.

76. UGI's management style manifested itself in the form of the intense micromanagement of the local gas plants.  Senior management of UGI constituted a supervisory committee or committees, called at various times the Committee on Works, the Management Committee, and the Committee on Operation and Maintenance.  *See* Macey Testimony at 13

77. By UGI's own account, one early method of control was to employ "sophisticated management techniques to direct its far-flung field operations" in order to ensure that all major decisions were made by, or run through UGI's core management.  *See* Shifrin Testimony at 32 and related exhibits.

78. Those techniques included the efforts of the "Works Committee," comprised of senior UGI management, that oversaw all local plant operations.  *See* Shifrin Testimony at 32.

79. The UGI Board of Directors created a Managing Committee along with a Committee on Works, later referred to as the Works Committee in November 1888.  The Managing Committee was created "to give final instructions upon all matters which shall be reported to it by the Committee on Works" and also "to consider and finally act upon all business which shall be brought before it by any officer of the Company."  *See* Blake Testimony at 10 and related exhibits; Macey Testimony at 15-16 and related exhibits.

80. The Committee on Works was expected to

> consider and decide all questions concerning the management of works, both engineering and commercial departments, the purchase of supplies, extensions, alterations and repairs of plant, and the employment and discharge of agents, superintendents and other employees at the various works, and the fixing of their salaries.  Said committee shall report upon the various matters that shall come before it to the Managing Committee, and shall not incur any liabilities, or

> authorize any expenditures for extensions or repairs involving over two thousand
> dollars ($2000) except subject to the approval of said Managing Committee, but
> may finally act up on all other matters entrusted to it.

*See* Blake Testimony at 10 and related exhibits; Macey Testimony at 15-16.

81. By 1892, UGI's President also sat on the Committee on Works and in 1894, the General Counsel was added to those serving on the committee.  In 1898, the Assistant Treasurer and Comptroller was added to the Committee on Works and in 1900 the committee was composed of UGI's President, Vice-Presidents, General Manager, General Counsel, Treasurer and Secretary, and General Superintendent.  *See* Macey Testimony at 16 and related exhibits.

82. In 1902, the UGI "Works Committee" was the "key management group" within UGI. *See* Shifrin Testimony at 32 and related exhibits.

83. The UGI *President's Report for the Year Ending December 31, 1902* explained in detail the composition of the Works Committee and the practices of UGI to ensure that UGI maintained control of its expanding gas business:

> The direct control and active management of the various companies in which your
> company is a shareholder are vested in their respective Boards of Directors, and each
> company has a complete official organization of its own.  But the Works Committee of
> your company passes favorably upon all property improvements and extensions, and
> contracts for supplies, before they are authorized.  This Committee meets every day and
> is composed of President, Thomas Dolan; Second Vice-President and General Manager,
> Samuel T. Bodine; Third Vice-President and General Counsel, Randal Morgan; General
> Superintendent, Walton Clark; and Treasurer, Lewis Lillie.  One member of this
> Committee is an executive officer, and the Treasurer of The United Gas Improvement
> Company is the Treasurer of each of the companies in which you are interested.  We are
> therefore in constant and close touch with their management, without in any sense
> making our company liable to the name of 'Trust.' . . . [T]hrough such a system as
> outlined above there can be and is co-operation in improving details of management, and
> each company in which The United Gas Improvement Company is a shareholder has the
> benefit of the advice of that company's experts in the purchase of supplies, in laying out,
> construction and operation of plants, in solving legal and financial problems, in
> canvassing for new business and in all the details which make for success in the
> management of a manufacturing company selling its wares to an entire community.  In
> furtherance of this theory, once a year the Superintendents and Commercial Agents of all
> the companies in which we are interested assemble in Philadelphia, on the invitation of

The United Gas Improvement Company, to read and discuss carefully prepared papers upon the various technical and commercial problems of the business in which they are engaged.

*See* Blake Testimony at 11 and related exhibits; Macey Testimony at 16 and related exhibits.

84. The above-referenced passage must be construed in historical context. At the time state corporate law required that corporations be managed by their boards of directors that were even more strict than the analogous statutory provisions that exist today. Any contract that impinged upon the ability of a corporation's board of directors to manage the company was void. In the context of this case, these legal requirements meant that UGI was required to create the pretense that local companies were controlled by their boards of directors in order that the lucrative service contracts that these local companies had with their corporate parents would not be deemed legally void. *See* Macey Testimony at 17.

85. The Works Committee, composed of the top ranking officials in the company, was closely involved in the daily operations of the various gas plants owned by UGI. The fact that this committee met "every day" and included all of the highest-ranking UGI officials illustrates the detailed level of management that UGI exerted over each of its subsidiary companies. Specifically, the president and vice presidents of this large company were making decisions on a daily basis regarding "the purchase of supplies, . . . construction and operation of plants, . . . legal and financial problems," and other various aspects of day-to-day operations. *See* Blake Testimony at 11 and related exhibits.

86. The Executive Committee, which first met in February 1904, essentially replaced the Works Committee. Its members were identical to those named in President Dolan's 1902 report and consisted of President Dolan, Second Vice President Bodine, Third Vice President Morgan, General Superintendent Clark, and Treasurer Lillie (although Morgan did not attend the first

meeting).  This committee continued to exercise a similar level of control to that previously
exhibited by the Works Committee.  *See* Blake Testimony at 12 and related exhibits.

87. The Executive Committee was composed of the President of UGI, two Directors, the
Third Vice-President, and the Treasurer.  On May 6, 1907, the Fourth Vice-President and
Secretary were added as members of the Executive Committee, and the Treasurer was excluded.
On June 24, 1909, the Executive Committee's composition was amended to include the First and
Second Vice-Presidents and to exclude the two directors.  On November 10, 1909, the Board of
Directors resolved that the Executive Committee's composition revert to its membership
immediately prior to the June 24 resolution.  On April 1, 1912, the Board of Directors amended
the Executive Committee's composition to include the Fifth Vice-President and to exclude the
Secretary.  On February 11, 1919, the Board of Directors resolved that the Executive Committee
be composed of the President, two Directors and all of the Vice-Presidents.  *See* Macey
Testimony at 17-18 and related exhibits.

88. Excerpts from the Minutes of the Executive Committee show that UGI exercised
control over its subsidiary companies, including its companies in Connecticut, because they
reflect a basic corporate strategy of "command and control from above" in which all of the day-
to-day decisions of the plants in Connecticut were made by UGI and its agents.  *See* Macey
Testimony at 18 and related exhibits.

89. The Executive Committee was responsible for:

Consider[ing] and decide[ing] upon all questions concerning the
management of works, including both the Engineering and Commercial
departments, the purchase of supplies, extensions, alterations and repairs
of plants, the employment and discharge of agents, superintendents and
other employees at the various works and offices, the fixing of all salaries,
except of such of the Committee as are salaried officers ....  All proposed
liabilities, expenditures, contracts and other business submitted to it by the

18

officers of the company may be finally disposed of by this Committee

. . ..

The Executive Committee regularly reported its activities to the Board of Directors.  *See* Macey Testimony at 17 and related exhibits.

90.  UGI President Samuel Bodine confirmed UGI's methods of financial control over its companies when he stated in 1916 that "no expenditures of money are made without the approval of the executive committee, which keeps full minutes of its proceedings for submission monthly to the board of directors."  *See* Shifrin Testimony at 31-32 and related exhibits; Blake Testimony at 12 and related exhibits.

91.  In addition to the detailed management and operational control of its properties, UGI also exercised control across subsidiaries in different states.  An example of the nature of UGI's control across its subsidiaries in different states is explained in the affidavit of Thomas Blake, submitted for the Manchester case.  *See* Blake Testimony at 7-8 and related exhibits.

92.  The Blake affidavit details UGI's acquisition of utility properties in Charleston, South Carolina using substantial funds from a "Reserve Fund" of another one of it subsidiaries, People's Gas Light Company ("PGL").  PGL never approved such use of its funds, nor would it have had any reason to do so for its own business purposes.  Essentially, UGI had control over PGL and all of its assets, and as a result UGI was able to transfer money from PGL for its own purposes.  The level of control exhibited by UGI and lack of decision-making authority given to its subsidiaries was not unique to PGL.  *See* Blake Testimony at 7-8 and related exhibits.

93.  Initially, UGI management and/or its Board of Directors approved each and every decision at the plants it owned or controlled.  *See* Blake Testimony at 10.

94. At UGI's annual management meeting key management personnel from all the operating businesses assembled to discuss important issues during that time period and UGI's approach to addressing them.  *See* Blake Testimony at 12.

95. UGI management was careful to maintain detailed operational control of each of the utility franchises that it owned or leased while maintaining the appearance of being at least partially locally owned and operated.  *See* Blake Testimony at 12.

96. UGI acquired and operated various manufactured gas plants and related gas franchises (referred to as the "operating companies") in Connecticut and across the United States for over 50 years.  Over this time span UGI grew in size, both financially and geographically. As a result of the rapid modernization of communications and travel during that same period UGI's methods of acquisition and control evolved, but UGI's operational practices and centralizing decision making at Philadelphia did not change.  *See* Blake Testimony at 7.

97. In addition to use of these early committees, UGI exercised control over the daily operations of its MGPs through the UGI General Superintendent and his department.  UGI's General Superintendent was responsible for the general engineering and physical operation of gas works, and approved all plans, extensions and betterments of gas works.  A key part of the General Superintendent's job was conducting regular inspections of UGI's gas plants.  These detailed inspections lasted for days and resulted in lengthy reports.  *See* Shifrin Testimony at 35 and related exhibits; Macey Testimony at 12 and related exhibits.

98. The General Superintendent also presided over annual conferences of the local superintendents of UGI's subsidiaries where practical and technical matters were discussed regarding "the operation of the plants that have been entrusted to our care."  At these meetings, all of the superintendents and commercial agents of UGI's operating companies would convene

in Philadelphia to read and discuss carefully prepared papers on various technical and

commercial problems, including waste-related issues.  *See* Shifrin Testimony at 35 and related

exhibits; Macey Testimony at 12-13 and related exhibts.

99. UGI had a publication it called the "UGI Engineering and Operating Notes"

("Operating Notes").  The Operating Notes were highly confidential UGI documents, entrusted

to each plant superintendent, to be retained in a "special filing binder."  They contained

information on gas making, tar and residual handling, equipment improvements, holder repair,

distribution practices, policies, manuals and rules.  The Operating Notes contain speeches of UGI

principals and executives such as Walton Clark, UGI Vice President, which repeatedly reference

UGI's operation of the plants "entrusted to our care and . . . direction of employee labor under

our charge."  *See* Shifrin Testimony at 35-36 and related exhibits; Macey Testimony at 13 and

related exhibits.

100.    The Operating Notes addressed the topics of tar and waste management, tank and

holder cleaning, leak repairs and related issues directly dealing with gas-making and waste-

handling.  Organizational charts showing the role "UGI Men" played at multiple MGPs around

the country are presented showing the UGI "empire."  The term "empire" was used by UGI to

describe itself.  *See* Shifrin Testimony at 36 and related exhibits.

101.    This system of "Associated Management," where UGI directly controlled the

MGPs within its domain, is set forth in express terms.  *See* Shifrin Testimony at 36 and related

exhibits.

102.    In the Operating Notes, UGI refers to the description of people and things beyond

its domain as "the outside world."  *See* Shifrin Testimony at 36 and related exhibits.

103.    UGI operated a Cadet Training Program.  This program trained gas engineers and indoctrinated them in UGI policies and procedures.  "This system provided a supply from which trained and experienced men may be drawn on short notice competent to fill positions of the [local] Company."  *See* Shifrin Testimony at 36 and related exhibits; Macey Testimony at 12 and related exhibits.

104.    It began in the early years of UGI "and continued up to the present time [1932]," "bringing in new technical graduates, training and developing them thoroughly in all phases of the gas and electric business."  This system was explained in an 1896 publication:

> The United Gas Improvement Company then instals [sic] its improved system, and places in charge a superintending engineer in its own employment, who reports to the general superintendent in Philadelphia.  The local operation is thus kept in close touch with the home office and at all times under the complete control of the home management.
>
> ********************
>
> The company has in its employ exercising a constant supervision over the operations of the various places a corps of the best gas engineers in the world.

*See* Shifrin Testimony at 37 and related exhibits.

105.    UGI announced in the UGI Circle its new class of cadets, explaining that "[m]any such men come each year into The UGI Company and the companies in which it is interested to fill the places of other engineers who have moved up the line as their experience has equipped them for greater responsibilities."  Engineers would be recognized for their achievement of graduating from the Program.  *See* Shifrin Testimony at 37 and related exhibits.

106.    Once they graduated, these cadets would then be sent to work at UGI MGPs around the country to operate those facilities. *See* Shifrin Testimony at 37 and related exhibits.

107.    Cadets were freely transferred among various UGI plants, including in and out of the Connecticut MGPs.  For example, UGI placed Edwin H. Williams at Waterbury-North as Superintendent in 1883, and he remained at Waterbury until at least 1908.  In 1927, UGI's

Management Committee approved the transfer of James H. Doak, Engineering Assistant, to Putnam. The placement of a Cadet Engineer at Meriden was approved in 1927 by UGI's Management Committee. *See* Shifrin Testimony at 37 and related exhibits; Macey Testimony at 23 and related exhibits.

108.    This process of transferring cadets among companies helped UGI maintain control of those companies. UGI placed them throughout its system because the company viewed its properties as its "empire." Because it controlled its empire so pervasively, UGI rewarded those employees loyal to it and to the "empire" by ensuring placement at one of its companies. Not only did this create worker loyalty to UGI, but it also allowed UGI to disseminate its practices and place men trained in its ways throughout its system. *See* Shifrin Testimony at 35 and related exhibits.

109.    Rollin Norris of UGI was responsible for the placement of Cadet Engineers throughout the UGI system. In an article he wrote at the time of his retirement, Norris stated that:

> for many years, it has fallen to my lot to be largely responsible for the selection of the Cadet Engineers of the Company, and for shifting them from plant to plant, as the opportunity for promotion arose."

*See* Shifrin Testimony at 38 and related exhibits.

110.    The preceding facts illustrate that a central force in UGI was directing the movement of the engineers who controlled plant operations. UGI had the authority to move employees from plant to plant, thus suggesting UGI played a role in the operations of its MGPs. The transfer of engineers from plant to plant suggests these were not independent operations. *See* Shifrin Testimony at 38.

111.    In 1923, UGI's Board of Directors created an Operating Committee, resolving,

"This Committee shall consider and make recommendations to the Board of Directors of the

various companies in which The United Gas Improvement Company owns a majority of the

capital stock: . . . on all questions concerning operation (including both the Engineering and

Commercial Departments), including the purchase of supplies, extensions, alterations and repairs

of plants, the employment and discharge and salaries of Agents, Superintendents and other

employees . . . ."  *See* Macey Testimony at 18 and related exhibits.

112.    In 1927, the UGI Board of Directors replaced the Operating Committee with a

Management Committee and a Committee on Operation and Maintenance.  The Committee on

Operation and Maintenance had responsibility for:

> Consider[ing] and mak[ing] recommendations with reference to the
> following matters relating to the operated properties other than the
> Philadelphia Gas Works:
>
> (1)    General conditions to business covering:
>                 Sales,
>                 Service,
>                 Operating Performance,
>                 Standards of Maintenance,
>                 Determination of action to meet any unusual operating
>                 situation.
> (2)    Extensions, alterations, repairs and improvement of plants,
>         distribution systems and other facilities.
> (3)    Engineering studies, plans, estimates and justification for
>         construction projects,
> (4)    Such other matters appertaining to operation and maintenance as
>         may be brought before the Committee by the Chairman . . . .

*See* Macey Testimony at 19-20 and related exhibits.

113.    The Committee on Operation and Maintenance was composed of the Vice-

President in charge of Operation and Maintenance, the Vice-President in charge of Promotion

and Sales, the Gas Engineer, and the Electrical Engineer. The Committee on Operation and

Maintenance met once a week. *See* Macey Testimony at 20 and related exhibits.

114.    The Management Committee's stated purpose was "to consider the following

matters relating to the operated properties other than the Philadelphia Gas Works:

(1)  Matters of General Policy and Public Relations and those affecting more than one
department or company.
(2)  General consideration of property transactions of importance.
(3)  Operating practices and standards.
(4)  Appointments, Promotions, Salaries, Wages and Working Conditions.
(5)  Contributions and Donations.
(6)  Club and Association Membership and Dues.
(7)  Office Leases.
(8)  Convention Attendance.
(9)  Rate Revisions.
(10) Monthly Reports of Insurance Department.
(11) Subscriptions to Periodicals.
(12) Record of Audits.
(13) Annual Sales, Operating, Construction and Cash Budgets.
(14) Review of Extensions and Improvements recommended by Committee on
Operation and Maintenance.
(15) Review of purchases of coal, oil, coke, pipe, etc. as recommended by Vice-
President-Purchases.
(16) Such recommendations as may be presented to the above Committee by other
Vice-Presidents."

*See* Blake Testimony at 12-13 and related exhibits: Macey Testimony at 18-19 and related

exhibits.

115.    The Management Committee was composed of the Vice-Presidents in charge of

the following departments: Finance, Public Relations, Engineering Development, Purchases,

Operation and Maintenance, Promotion and Sales, and Accounting. *See* Macey Testimony at 19

and related exhibits.

116.    The Management Committee met at least weekly to supervise UGI's network of

gas companies and coordinate the efforts of various departments by "a final unanimous

recommendation on each subject under consideration." The Management Committee scrutinized

operations of the individual companies through budgetary control and a system of monthly

operations and maintenance reporting, among other means.  UGI required Management

Committee approval for construction work on its MGP properties and required the use of UGI's

subsidiary contracting company for work at its various MGPs.  *See* Shifrin Testimony at 33 and

related exhibits.

117.    One of the Management Committee's regular activities was to send instructions to

the managers of the companies in which UGI was interested. For example, on February 10, 1927,

"President Thompson submitted for the consideration of the [Management] Committee a

proposed form of letter to be sent to the Managers of the Operating Companies, outlining a

policy to be pursued in the matter of size of inventories to be carried and quantities of purchases

to be made from time to time."  *See* Macey Testimony at 19 and related exhibits.

118.    UGI's Management Committee frequently disseminated protocols and procedures

applicable to its controlled operating companies.  Uniform policies and procedures were sent out

by UGI's Management Committee and employed by the various gas plants throughout the

country, and in Connecticut specifically.  For example, with respect to its various operating

companies, the UGI Management Committee set the hours of operation and the holidays to be

observed, approved operating, sales, construction, cash and financial budgets, approved even the

most minor charitable contributions and set maximum donations for each company on an annual

basis, transferred employees among its many operating companies, set the salaries of managers

at the operating companies, approved contracts for the purchase various items such as raw

materials, and set budgets for convention expenses of the various operating companies.

Moreover, UGI approved its controlled operating companies' contracts to purchase coal and

other gas making feedstocks.  It designed, ordered, installed, maintained and inspected gas

making and storage equipment at its sites.  Its engineers inspected the plants, and at times, UGI's direct employees operated the plants.  *See* Macey Testimony at 21-22 and related exhibits.

119.    UGI controlled the operational policies of the companies within its control, dictating aspects both important and banal.  For example, the Management Committee issued a policy on the format and use of letterhead.  The Committee also issued a policy on the number of hours and days per week employees could work.  *See* Macey Testimony at 23 and related exhibits.

120.    The Minutes of the UGI Management Committee show that UGI did not allow its subsidiary companies, including the Connecticut MGPs, to take corporate action without approval from UGI in Philadelphia.  *See* Macey Testimony at 21.

121.    The detailed nature of the Management Committee's responsibilities demonstrated that almost forty years after the Works Committee was formed by UGI to "consider and decide all questions concerning the management of [manufactured gas] works," UGI management, through the newly chartered Management Committee, was still controlling all important (and even most minor) decisions at each of its operating properties.  *See* Blake Testimony at 13 and related exhibits.

122.    The above listing of "matters related to the operated properties other than the Philadelphia Gas Works" for which the Management Committee was responsible demonstrates that UGI management was controlling each of the operating properties.  Responsibility for "[o]perating practices and standards," "[a]ppointments, [p]romotions, [s]alaries, [w]ages and [w]orking [c]onditions," and the "[r]eview of purchases of coal, oil, coke, pipe, etc. as recommended by Vice-President-Purchases" encompassed  key management activities involved

in the daily operations of the local manufactured gas plants and distribution systems.  *See* Blake
Testimony at 13-14.

123.    In 1927, UGI published a pamphlet to celebrate its forty-five years of operation.
Of its management practices, UGI explained, "The United Gas Improvement Company
maintains at its general offices, Broad and Arch Streets, Philadelphia, an organization of self-
contained departments, each specializing in a distinct phase of managing operating financing,
engineering and constructing public utilities."  The pamphlet continues:

> The personnel of The United Gas Improvement Company and the
> Operating Companies is cordial and co-operative.  It is fostered by annual
> management meetings and conferences, at which the representatives of the
> Operating Companies take an active part in a program covering formal
> and informal discussion of all phases of the business .... Complicated
> problems in finance, engineering, commercial or rate matters are thus
> assured of exhaustive study in conference with the Management
> Organization and final recommendations to the various Boards of
> Directors of the Operating Companies are made only after every angle of
> the subject has been given due consideration.

*See* Macey Testimony at 20-21 and related exhibits.

124.    In October 1927, UGI President Arthur Thompson provided an outline for the
UGI Management Committee of the "underlying principles" that should guide them in their
dealings with the controlled companies.

- He began by noting that the Management Committee needs to focus on "larger and more
  important questions of policies" and should "free itself as much as possible from details
  in connection with the operations of the various companies ...."

- Thompson endorsed the practice of having the Management Committee meet
  occasionally with plant managers so they will know the Management Committee takes "a
  vital interest in the various companies under its control...."

- He explained the value in having local company presidents attend UGI Board of
  Directors meetings so they could be questioned about their properties "in order that they
  thus may be stimulated to the greater sense of the responsibility of the properties under
  their care...."

- Finally, "The President called attention to the necessity of having patience with the local presidents or managers" and, rather than do everything for the controlled companies, "it would be much better to take the time necessary to train the local man to think for himself."

*See* Shifrin Testimony at 38-39 and related exhibits; Blake Testimony at 14 and related exhibits.

125.    President Thompson revisited this subject six months later at the April 5, 1928 Management Committee meeting when he reiterated the importance of maintaining contact with UGI's "various utility subsidiary companies" in order to keep them "familiar . . . with the various plans and suggestions offered by this company's [UGI's] organization from time to time." Mr. Thompson went on to discuss a method for "formulating policies and the promulgation of same for the benefit of the utility subsidiary companies" and ways to secure "the full cooperation of the local management." *See* Blake Testimony at 14 and related exhibits.

126.    Although the UGI minutes often referred to recommendations, plans, suggestions, or advice offered by UGI, it was clear that these were communications to the subsidiary companies' management directing the specific actions necessary to operate the business. There is no evidence, for example, of the Connecticut companies' local management failing to implement the actions specified by UGI, despite UGI's characterization of the instructions as recommendations or suggestions. *See* Blake Testimony at 14-15.

127.    In addition to its Board of Directors and the specific committees whose minutes document their responsibilities for controlling the operated properties, UGI had officers, managers, engineers, researchers, auditors, and other employees who were also directed to control the operations of and provide direction to the operated properties. Information from miscellaneous reports, letters, memos, and other such internal UGI sources further confirm that UGI exercised detailed control over its operating properties. *See* Blake Testimony at 15-16 (listing specific examples).

29

**UGI's Eccentric Relationship With Its Controlled Companies Attracted Scrutiny From The Federal Government and Ultimately Resulted in the Forced Break Up of UGI's MGP Empire**

128.    UGI's control over the Connecticut Companies was pervasive and eccentric.  *See* Macey Testimony at 17.

129.    Throughout its "empire", UGI tightly controlled the MGPs within its vast corporate structure, while simultaneously attempting to hide this control.  UGI worked diligently to mask its control and create the appearance that companies like the Connecticut Companies were independent.  *See* Macey Testimony at 31 and related exhibits.

130.    UGI conducted this subterfuge, in part, to avoid inquiry into practices that benefited UGI to the detriment of its subsidiaries.  Eventually however, regulators and legislators became aware of these practices both at UGI and elsewhere.  *See* Macey Testimony at 31.

131.    The relationship between UGI and its subsidiary companies became the subject of intense national concern because their operations, ownership and corporate governance all were extremely difficult to monitor and to regulate, because they were accumulating both massive amounts of debt and significant political power, and because the holding companies were involved in a large amount of self-dealing with the companies they controlled.  *See* Macey Testimony at 11-12.

132.    The relationship between UGI and its subsidiaries and affiliates followed the classic format that existed prior to, and motivated the passage of, the Public Utility Holding Company Act.  *See* Macey Testimony at 29.

133.    The holding company, in this case UGI, controlled a multitude of operating companies, such as CL&P and its predecessors.  These companies produced and disposed of energy.  For speculative purposes, a new holding company, in this case the Connecticut Electric

Service Company, would be set up between the existing holding company and its subsidiaries. The new holding company would put up only a small amount of its own money, but would buy a controlling share in the existing holding company and/or the lower level operating companies. These financial maneuvers created tremendous leverage. *See* Macey Testimony at 29-30.

134.    Through manipulation of the holding company structure, the parent company would collect much of the stock dividends and bond yields of the operating companies.  It would also impose management and other fees down the line to the operating companies, which would often effectively loot those companies. *See* Macey Testimony at 30.

135.    For example, in 1927, it became UGI's practice to enter into management contracts with its subsidiary companies.  The contracts provided that UGI would act as a "general operating, construction and financial adviser," participating in all areas of the companies' operation, including financing, reorganization, maintenance, research, development, promotion and sales, accounting, purchasing, legal, secretarial, and statistical services.  The subsidiary companies were required to pay for this supervision.  These agreements were the means by which UGI maintained control over its far-flung subsidiaries, and the mechanism by which UGI was able to retain direct control and active management of the various companies in its empire. *See* Macey Testimony at 21 and related exhibits.

136.    Writing about the Public Utility Holding Company Act, Roosevelt said, "Through the device of these pyramided holding companies, small groups of men with a disproportionately small investment were able to dominate and to manage solely in their own interest, tremendous capital investments of other people's money."  Elsewhere, Roosevelt accused the holding companies of "looting."  The scale was significant.  During the 1920s, fully one third of all

corporate financing in America was issued by gas and electric companies. *See* Macey Testimony at 30 and related exhibits.

137.    Writing in the magazine, The Nation, Isidor Feinstein alleged that "The same group sits on both sides of the table in fixing management fees, construction costs, and financing charges," and that without federal regulation the consumer was paying "a premium on inefficient operation, costly management, and a bloated capital structure." UGI's various subsidiaries, Feinstein noted, were providing the parent company with average annual returns ranging from 11 percent to as high as 84 percent. *See* Macey Testimony at 12 and related exhibits.

138.    "The vise of these business practices was that the holding company charges took the form of 'excessive management fees, unreasonable construction costs, excessive payments for supplies and equipment, and unduly high charges for interest and for underwriting services.'" *See* Macey Testimony at 32 and related exhibits.

139.    UGI took advantage of its companies by having the UGI Contracting Company perform the majority of their construction work. *See* Macey Testimony at 32 and related exhibits.

140.    These types of improprieties were also described in other portions of the record. In 1921, the United States Justice Department stated that UGI had:

> secretly absorbed its remaining competition and had engaged in collusive bidding which enabled it to secure exorbitant prices. It continually and successfully sought to restrain and monopolize trade in violation of the Sherman anti-trust act of 1890.

*See* Macey Testimony at 32 and related exhibits.

141.    A timeline of specific UGI Management Committee Minutes provides examples of UGI-initiated, one-sided, related-party arrangements and shows that UGI was focused on

creating the appearance of local independence and an advisory relationship to UGI.  *See* Blake Testimony at 47-49 (containing list of specific evidence).

142.    The United States government's interest in holding companies and trusts in the late 1920s caused UGI to begin hiding its ownership and control of the Connecticut Companies. Examples from the UGI Management Committee Minutes coupled with information contained in the FTC investigation, demonstrate that UGI sought to create the appearance that CL&P and the Connecticut MGPs were independent of UGI's influence and control.  *See* Blake Testimony at 45-51 and related exhibits.

143.    As the consolidation of gas and electric franchises was occurring in the second half of the 1920s, the Federal Trade Commission became increasingly concerned with the consolidation and concentration of power in the hands of a small number of companies, particularly UGI.  These concerns ultimately resulted in U.S. Senate Resolution 83 on February 15, 1928.  *See* Blake Testimony at 46.

144.    This resolution led to the preparation of detailed reports on "the actual investments, financial transactions, business operations, earnings and other economic results of electric power and gas utility companies, their holding companies, and their associated or affiliated companies."  *See* Blake Testimony at 46 and related testimony.

145.    In 1930, Lewis G. Prichard, who worked for the FTC's Economic Division, filed a report on UGI pursuant to the United States Senate resolution.  His report included the following findings:

- "U.G.I. maintains a list of the employees of system companies and knows the efficiency and value as near as possible of the system company men. … This supervision of personnel makes it possible to build up the entire staff of system company men in line with the policies of U.G.I. and likewise find the best men for specific jobs."

- "The entire staff of U.G.I. is engaged in rendering service to subsidiaries except those who are doing that work which is entirely peculiar to the business of being a holding company."

- UGI President Thompson wrote a letter to President Roraback of CL&P in which he explained why UGI "adhers [sic] to the policy of supervising the operations of subsidiary [sic] companies. Quoting from this letter, 'interest is taken in properties on the theory and basis of making an investment and of applying the U. G. I. system of supervision and placing at the disposal of the president and local officers men of wide experience. . . . The outstanding point which I am endeavoring to emphasize is that we do not seek such contracts only for the fees which shall be received under them, and which, I repeat, are purely secondary, but because it is believed that only by the application of the principles and methods of the consulting work of experienced men, will the results which were anticipated when the properties were acquired by realized, and such action in purchasing them be justified.'"

- UGI negotiated the "future delivery contracts" and fuel purchasing for its system companies.

- UGI's "Purchasing Department makes arrangements for a system company to sell its by-products produced in manufacturing gas" as necessary.

- UGI's Legal Department handled most of the agreements and contracts for system companies, primarily relating to the "purchase and sale of gas and electric energy."

- UGI's Department of Operation and Maintenance was responsible for analyzing the company's operating procedures and making recommendations that would enable UGI "to obtain for its system as a whole the maximum efficiency." This department studied such things as main extensions, gas pressures, installation of apparatus, operating standards, raw materials, and operating conditions. The Department of Operation and Maintenance was also in charge of "the training, maintenance and organization of adequate forces." Furthermore, members of this department were "assigned the task of making inspections of system companies' works, production, distribution, transmission, stores, transportation or accident hazards."

- UGI's Engineering Development Department "will advise and assist in reference to engineering development problems arising in the operating and extension of the Company's [UGI's] properties." This department kept up with the latest innovations in the manufactured gas industry and made sure that all UGI subsidiary utility companies were operating efficiently and uniformly according to the current industry standards and UGI's specifications.

- UGI created a manual for its subsidiary utility companies to follow with regard to preparing budgets. The procedure for budget approval involved submission of a preliminary budget by the system company to UGI followed by a review by "various members of the staff of U.G.I." who would make changes and suggestions. The budget would then be sent back to the system company, and after the system company incorporated UGI's feedback and created a final budget UGI would approve it. UGI also required system companies to have UGI approval for large expenditures (anything over $1,000) and for any expenses which exceeded the pre-authorized budget.

*See* Blake Testimony at 16-17 and related exhibits.

146.    An employee of the UGI Contracting Company acknowledged improprieties to a Federal Trade Commission investigator in 1935, indicating that the costs UGI charged its subsidiaries to do work "far exceeded competitive prices for similar work," and that the work often exceeded estimates.  He indicated that subsidiaries "were forced to pay greatly in excess of the true value of the services" and that the work would have been done much less expensively if it had been bid competitively.  *See* Macey Testimony at 33 and related exhibits.

147.    "The FTC and the Senate found that holding companies, while providing services to operating and subsidiary companies, clearly disadvantaged those companies.  They reported that: (1) the concentration of earnings using preferred and non-voting stock raised earnings in some cases as high as 138%; (2) often the service charges (management fees) were excessive, as were the profits earned; (3) in many cases, the charges for services rendered were not based on cost but rather on excessive and sometimes extortionate rates; (4) profits on services rendered by the holding companies ranged from 20 to 179%; the excessive profits concentrated earnings further in the hands of those who controlled the holding companies."  *See* Macey Testimony at 33 and related exhibits.

148.    UGI was required to create the pretense that local companies were controlled by their boards of directors in order that the lucrative service contracts that these local companies had with their corporate parents would not be deemed legally void.  *See* Macey Testimony at 33 and related exhibits.

149.    UGI followed this pattern and practice with its subsidiaries throughout the United States including those in Connecticut.  UGI dominated its subsidiaries' boards, approved and controlled their ability to enter into contracts and directed their purchasing and personnel decisions for CL&P.  UGI controlled the gas making process at its subsidiaries through these

decisions.  Accordingly, the wrongful conduct, injustices and fraud described in the accounts set forth above are reflective of the wrongful conduct, injustices and fraud that UGI engaged in Connecticut.  *See* Macey Testimony at 33.

150.    In response to the increasing scrutiny by the regulators, UGI implemented various changes to policies and procedures relating to its control over its operating properties and specifically the Connecticut Properties:

- February 16, 1921 – Garfield Scott (who at various times worked as General Counsel for UGI and for CL&P) wrote a letter to J. Henry Roraback of CL&P stating that "[w]e are endeavoring to have all the property transferred to the name of the Connecticut Light and Power Company, or if not in its name then in the name of someone in Connecticut rather than to let the property remain in the name of someone in Philadelphia."  The exact properties to which Scott was referring is unclear, but the important point is that UGI wanted to create the appearance that these properties were not directly linked to Philadelphia and therefore UGI.
- December 1, 1927 – The Management Committee minutes record that "UGI Vice-President Gadsden suggested, and the Committee concurred, that it would be desirable, wherever possible, to use personal contact in inaugurating U.G.I. policies in the Connecticut situation rather than correspondence."
- December 15, 1927 – At a UGI Management Committee meeting, "The Chairman stated that The U.G.I. Contracting Company had arranged to remove its name from all signs posted in connection with construction or repair work on behalf of the Connecticut Companies, in order that any advantages from a publicity standpoint in connection with such work might accrue in favor of the Connecticut Companies."
- April 5, 1928 – During a UGI Management Committee meeting, "[t]he Chairman called attention to the confusion that had been caused by department heads and their subordinates of this Company's [UGI's] organization communicating from time to time directly by letter or telephone with department heads or their subordinates asking for data or information required in connection with the routine."  He went on to remind the committee that according to "General Instructions No. 1, issued under date of July 14, 1927, item (2) of said instructions reading as follows:  'All correspondence will be conducted with the Managing Officer and over the name of the Department Head, so that there will be uniformity and understanding as to matters under consideration regarding individual property.'"
- January 23, 1930 – The Vice President of CL&P, Irvin W. Day, wrote to five members of his staff stating that all letters to UGI from "any of the Departments attached to the Waterbury General Office Staff, except the Purchasing Department" should be addressed to UGI's Vice President Fred B. Hofft and signed by or for Day himself.  The purpose was to "eliminate any direct correspondence between any person in this office [CL&P's Waterbury office] with any person in the UGI office except between Mr. Hofft and myself [Day]."

*See* Blake Testimony at 47 and related exhibits.

151.    The types of abuses that UGI practiced with its subsidiaries is reflected and illuminated by a transaction UGI orchestrated between several controlled subsidiaries, including the Charleston, South Carolina and Manchester, New Hampshire MGP sites. This transaction, in which UGI transferred funds from a well-financed subsidiary to an undercapitalized subsidiary (Charleston), is an example of the power UGI had over its subsidiaries and the disregard it displayed for corporate formalities. *See* Macey Testimony at 34.

152.    The Peoples Gas Light Company of Manchester, New Hampshire (PGL) was a UGI subsidiary controlled in the same manner as Charleston. When UGI acquired Charleston in 1910, capital was needed. Part of that capital was supplied from the PGL's reserve fund. UGI, without approval from the PGL Board of Directors, sold bonds from PGLs reserve fund and used the proceeds to purchase for PGL stock in Charleston. UGI "approved" this transaction before the PGL Board even had a chance to consider it. It was not until two weeks later that the PGL Board approved this transaction. The PGL Board had no opportunity to discuss or evaluate these investments. *See* Macey Testimony at 34 and related exhibits.

153.    The investments that UGI forced PGL to sell were bonds that had a guaranteed revenue stream from interest payments. The Charleston stock had no such guaranteed revenue. The "absence of this guaranteed revenue could have put PGL at a cash flow or liquidity risk," yet UGI ignored that threat to PGL and never even gave PGL the chance to assess that threat. *See* Macey Testimony at 34 and related exhibits.

154.    This transaction provides an example of UGI engaging in activities illustrative of corporate wrong-doing. Viewed in the totality of the circumstances, this is one more example of the manner in which UGI thoroughly dominated its subsidiaries, including those in Connecticut,

and acted in its own best interest, regardless of the negative effect those actions had on the subsidiaries. *See* Macey Testimony at 35 and related exhibits.

155.    Ultimately, FTC investigations and extensive Congressional hearings led to the passage of the 1935 Public Utility Holding Company Act (PUHCA). Throughout the process, "UGI vigorously protested efforts by the government to break up its tightly managed empire." *See* Macey Testimony at 32 and related exhibits.

156.    An article published in the February 3, 1941 issue of *TIME Magazine*, titled "Disunited Gas Improvement," explained how Section 11 of the Public Utility Holding Company Act of 1935 and the SEC's integration plans were designed to break up UGI's "empire." It also specifically identifies CL&P as one of the units UGI would be required to relinquish control of upon enforcement of Section 11. *See* Blake Testimony at 50 and related exhibits.

157.    Another article from November 1941 published in *The Journal of Land & Public Utility Economics* confirms that the Public Utility Holding Company Act of 1935 specifically targeted UGI. *See* Blake Testimony at 50 and related exhibits.

158.    In 1941, the SEC directed UGI to divest itself of properties in Arizona, Connecticut, Illinois, Indiana, Michigan, New Hampshire, New Jersey, Ohio, and Tennessee. In 1943, UGI's subsidiaries were selling electricity or gas to more than five million customers in seven states, but, by the end of 1953, these operations were limited to eastern Pennsylvania. *See* Macey Testimony at 14-15 and related exhibits.

159.    In 1943, the federal government provided a description of the UGI system: "UGI exercises control over, and renders supervisory services to, these subsidiaries from its principal office located in Philadelphia, Pennsylvania." *See* Shifrin Testimony at 39 and related exhibits.

160.    It has also been stated that:

> [UGI] operates these outlying companies and businesses in large part from its main office in Philadelphia. Its representatives traveling from Philadelphia make inspection trips, render advice and assistance, receive weekly and monthly reports, use the mails and the long distance telephone to convey orders and suggestions, and in general control the policies and operations of the subsidiaries.

*See* Shifrin Testimony at 39 and related exhibits.

161.    In 1952, the SEC approved a plan to reorganize UGI by dissolving the holding company structure, merging its remaining subsidiaries into UGI, which became a Pennsylvania public-utility operating company, dissolving its non-utility subsidiaries, and disposing of its stock in non-subsidiary companies. *See* Macey Testimony at 15 and related exhibits.

162.    When UGI disposed of its interest in CL&P's predecessors, the President of UGI explained to stockholders, "[W]e have voluntarily sold our 60 per cent interest in the common stock of The Connecticut Light and Power Company, representing an investment of over $27,000,000. The reasons which led to the conclusion to sell this investment were that as the [SEC] hearings proceeded it became apparent that we would not be successful in establishing the prerequisites necessary to retention of the stock under the applicable section of the [Public Utility Holding Company] Act." *See* Macey Testimony at 15 and related exhibits.

163.    UGI's numerous committees and Board members' involvement in its various operating companies, including those in Connecticut at issue in this case, essentially made the local operating companies superfluous. The local companies' boards acquiesced to UGI's directions and, therefore, were mere alter egos of UGI. *See* Macey Testimony at 23.

### Gas Making and Tar Making At MGPs Were Inextricably Linked

164.    There were many ways that today's contamination could have been released during normal MGP operations. For example

- **Equipment installation**: Tanks, piping, *etc.* installed during an owner/operator period that leaked tar or other contamination created contamination that is the responsibility of that owner and/or operator;

- **Equipment operation and maintenance**: Tanks, piping, *etc.* operated, inspected, or maintained and that leaked tar or other contamination created contamination during an owner operator period that is the responsibility of that owner and/or operator; and

- **Specific waste management decisions**: Owner/operator control over waste management, such as allowing the use of disposal areas or treatment systems, bear responsibility for today's impact of such waste discharges.

*See* Shifrin Testimony at 40.

165.    The creation and release of tar at MGPs was the result of the decisions and actions regarding training, hiring and directing the MGP's superintendent and employees, and designing, installing, inspecting, maintaining and repairing the equipment used to manufacture, store and distribute gas and tar at the MGP.   *See* Shifrin Testimony at 41.

166.    UGI controlled the gas making, and thus the tar making, at the Connecticut plants through various means of engineering and engineering management, including

- Equipment design;
- Equipment installation;
- Implementation of operational policies and procedures;
- Operation training, guidelines, and enforcement;
- Inspections with follow-up requirements;
- Local presence of UGI personnel;
- Local Board of Directors domination;
- Instructions regarding waste handling;
- Purchasing materials, equipment and feedstocks;
- Testing of byproducts;
- Training UGI cadet engineers and then assigning them to UGI plants;
- Providing instruction on plant operations and waste handling, such as through the Engineering and Operating Notes;
- Budgeting decisions;
- Approval of donations and expenditures;

- Conducting audits;
- Weekly and even daily headquarters review/approval of plant operations; and
- Decommissioning.

*See* Shifrin Testimony at 41-42.

167.    UGI's subsidiaries and divisions existed to further implement such operational controls, and were involved with CL&P plant operations, including:

- MGP equipment construction companies (UGI Contracting, United Engineers);
- An inspection company (Day & Zimmerman);
- Divisions handling coal and tar sales and purchasing (the headquarters purchasing department was often in charge of local plant material purchasing); and
- A technology division for operations improvements (UGI Department of Tests and Laboratories).

*See* Shifrin Testimony at 42.

168.    In 1933, the Federal Trade Commission described UGI's empire as controlling every aspect of gasmaking:

Manufacturing of gas; manufacturing gas making machinery; purchasing, leasing, building, improving, operating, and selling works for the supply of light and fuel produced from gas, or in any other manner; and of purchasing and selling materials and patent-rights and of receiving and granting licenses thereunder, and the manufacture and sale of machinery connected therewith.

*See* Shifrin Testimony at 42 and related exhibits.

169.    Seeley's survey (1927) of 50 of the larger CWG producers by the Subcommittee on Water Gas Tar Emulsions of the American Gas Association (AGA) reached conclusions on possible causes of tar emulsion formation, which included the type of solid fuel (*e.g.*, coke *vs.* coal), source, amount, and physical characteristics of liquid fuel (oil), operating temperatures, and heat content (BTU) of the gas produced.  *See* Shifrin Testimony at 43 and related exhibits.

170.    A second survey prepared by the AGA Water Gas Committee identified tar emulsion causes as follows (paraphrased from Mr. R.E. Kruger's findings reported in Seeley, 1927):

> High heats, low heats, dirty carburetors and superheaters, improper steam rates, insufficient carburetting and superheating capacity, mixing of various condensates, too much agitation in separators, insufficient separator capacity, improper condensing, possible acid condition of circulating water, gas oil having both low initial and heavy ends, glazing of superheater and carburettor brick due to NaCl in the oil, insufficient atomizing capacity, crowding oil into machine beyond its capacity.

See Shifrin Testimony at 43.

171.    The surveys illustrate that various operating parameters (e.g., steam rates, feedstock selection) of MGP operations impact the amount and quality of tar formed during MGP operations.  See Shifrin Testimony at 43.

172.    Given that making gas inextricably resulted in making tar, UGI's control over the operations of the Connecticut MGPs unavoidably involved the management and disposition of tar.  In addition, it was not possible to make tar without inadvertently releasing it to the environment during the MGP era.  Therefore, since UGI controlled gasmaking, it controlled tarmaking, and thus was responsible for such inadvertent tar releases.  See Shifrin Testimony at 43-44 and related exhibits.

**The Present Contamination Footprints at the Connecticut MGP Sites and Location of MGP Equipment That UGI Designed, Installed, Inspected and Operated Are Related**

173.    Dr. Shifrin's report summarized and depicted known tar and oil observations at each site and those observations were described in his testimony.  See Shifrin Testimony at 44.

174.    These descriptions are based on all available boring logs, which denote NAPL (nonaqueous phase liquids, i.e., tar or oil) presence in various ways, such as, "tar," "tar blebs," "sheen," "oil," etc.  Dr Shifrin noted whether the observed NAPL was mobile to allow migration

to the next pore, or residual (less than about 10% of the pore space and no longer mobile). *See* Shifrin Testimony at 44.

175.    This information gives an indication of the amount of material present, which allows judgment about source intensity and location. *See* Shifrin Testimony at 44.

176.    Dr. Shifrin then aligned this contamination with the location of equipment installed or managed by UGI. From these comparisons, including consideration of tar migration, he made determinations showing UGI-controlled equipment caused observed NAPL contamination. *See* Shifrin Testimony at 44 and related exhibits.

177.    Remedy requirements at these former MGPs are driven predominantly by NAPL presence and thus the responsibility for NAPL releases is linked directly to responsibility for response costs. *See* Shifrin Testimony at 44-45 and related exhibits.

178.    The studies done of the Connecticut MGP sites were able to determine what kinds of environmental contaminants are found today in the soils, groundwater, sediments and other aspects of the site. Dr. Shifrin reviewed these studies, and based on his expertise, linked those contaminants to a certain pieces of equipment, based on the nature and pattern of the contaminants. Based on the historical documents, which provide the basis for understanding the dates and pieces of equipment and/or practices UGI controlled, he conclusively linked the contamination to UGI. *See* Shifrin Testimony at 44; Exhibits 13-33.

**UGI's Acquisition of The Connecticut Properties**

179.    After having been in Connecticut since 1884 (at Waterbury), UGI commenced what it termed the "Connecticut Consolidation" in the early twentieth century. It did so by creating and controlling certain utility holding companies in Connecticut ("the UGI Controlled Holding Companies"). These subservient holding companies operated in various forms that

ultimately became The Connecticut Light & Power Company(CL&P). *See* Macey Testimony at 26 and related exhibits.

180.    The origins of CL&P reach back to the early 1900s. After various Connecticut utilities were merged, the Connecticut Railway and Lighting Company emerged. UGI controlled Connecticut Railway and Lighting Company, and UGI operated and managed the properties of this company (which included the Norwalk Gas Plant). For example, at the various properties of the Connecticut Railway and Lighting Company, UGI controlled the hiring, entered into contracts, set the rates, authorized sales, and made improvements and repairs. *See* Macey Testimony at 26 and related exhibits.

181.    "In 1901 the Connecticut Railway and Lighting Company was formed, and from then on there was intensive development in the construction of steam plants in the Westchester Lighting Company territory and in Connecticut, at Waterbury, New Britain, South Norwalk and Bridgeport." *See* Macey Testimony at 26 and related exhibits.

182.    In 1906, the Connecticut Railway and Lighting Company leased all of its properties to the Consolidated Railway Company, a subsidiary of the New York, New Haven, and Hartford Railroad. All of the Connecticut properties were reacquired from the New York, New Haven, and Hartford Railroad in 1917. *See* Macey Testimony at 26-27 and related exhibits.

183.    On March 29, 1917, CL&P was formed out of the Rocky River Power Company, which had just merged with the Housatonic Power Company. The Rocky River Power Company was founded in 1907 by J. Henry Roraback. *See* Macey Testimony at 27 and related exhibits; Blake Testimony at 51 and related exhibits.

184.    On June 27, 1917, an agreement was executed between Connecticut Railway and Lighting Company, The Housatonic Power Company, United Electric Light and Water

Company, and the New York, New Haven and Hartford Railroad Company. The effect of this new agreement was to transfer control of various Connecticut utilities to CL&P immediately after its 1917 formation. *See* Macey Testimony at 27 and related exhibits; Blake Testimony at 51 and related exhibits.

185.     Additional entities owned and used by UGI to control utilities in Connecticut included the Connecticut Electric Syndicate (the Syndicate), which began operating in 1917, until it was succeeded by UGI's Connecticut Electric Service Company (the Service Company) in 1925. These vehicles were used to control UGI's interests in utility properties in Connecticut, by facilitating the acquisition and merger of various Connecticut utility companies into the UGI-controlled CL&P. *See* Macey Testimony at 27 and related exhibits; Blake Testimony at 34 and related exhibits.

186.     After the end of World War I, UGI resumed its strategy of growth via the acquisition of MGPs and distribution franchises. In Connecticut, UGI acquired control of eight additional gas plants beginning in 1924 either directly or indirectly through the use of intermediary companies UGI established and controlled. *See* Blake Testimony at 34.

187.     During this period of growth, the acquired businesses were integrated into UGI policies and procedures and were managed and controlled by UGI not only individually but also as a group, which UGI management referred to as the "Connecticut Properties" or the "Connecticut Companies." *See* Blake Testimony at 34.

188.     The *New York Times* reported on December 20, 1925 that the "[a]malgamation of eight Connecticut Utility companies under the auspices of the Connecticut Electric Service Company was announced yesterday. . . . The President of the Connecticut Electric Service Company is Randall Morgan of Philadelphia, Chairman of the Finance and Executive Committee

of the United Gas Improvement Company.  The Connecticut Railway and Lighting Company and the Connecticut Light and Power Company are members of the United Gas Group." *See* Blake Testimony at 35 and related exhibits.

189.    Mr. Morgan's appointment as the president of the Service Company (which owned 100% of CL&P) while he was also an executive of UGI remained consistent with the control strategy discussed in the 1902 UGI President's report wherein executives of UGI were made executive officers of the subsidiaries to facilitate UGI's direct operational control of the local subsidiaries.  *See* Blake Testimony at 35 and related exhibits.

190.    UGI used the Syndicate to acquire the Meriden Gas Light Company in 1925, whereupon it was sold to the Service Company and ultimately merged into CL&P.  The Service Company was used to acquire additional manufactured gas plants and their related distribution franchises including the Bristol and Plainville Electric Company (which owned the Bristol MGP) and The Middletown Gas Light Company in 1927, the Winsted Gas Company and the Waterbury Gas Light Company in 1929, and the Rockville-Willimantic Lighting Company in1930.  These businesses were eventually merged into CL&P "to facilitate the operation and effect economies," according to the 1927 Service Company Annual Report.  *See* Blake Testimony at 35-36 and related exhibits.

191.    The *U.G.I. Circle*, the internal newsletter of UGI and its associated companies, reported UGI's growth in Connecticut in its November 1929 issue, stating that the "towns served with gas in 1918 were but three, while in 1928 they had increased to eight." *See* Blake Testimony at 36 and related exhibits.

192.    The *U.G.I. Circle* also quoted a *Hartford Times* report which called attention to the amount of new capital invested by CL&P during this time period, "which is strong evidence

of the confidence the owners of the property have in the development of Connecticut." The

article then explained that the "entire common stock of the Connecticut Light and Power

Company is owned by the Connecticut Electric Service Company, of which latter company,

U.G.I. owns a substantial interest." *See* Blake Testimony at 36 and related exhibits.

      193.    The management of UGI's investments in companies was explained by President

Thompson at the 1928 Annual Management Conference attended by more than 600 "officers and

members of the supervisory forces" of "The United Gas Improvement Company and Associated

Companies":

> Our policy now, which as you know has been decided by our Board of Directors and
> which has been adopted in particular reference to the holding company question, is that
> we are more in the position of an investment company, that we are more and more taking
> a greater investment in the companies that we are already interested in, and in those that
> we do not own all of the stock, we are gradually acquiring it where it seems feasible and
> the prices are right – a greater interest in those properties, and bringing about through our
> management group or advisory group a contact, an organization which will function in
> such a way as to further these aims that I have outlined to you.
>
> And so today we are grouping these properties and placing at the heads of the properties
> men of understanding and ability, of tact, in fact with all the qualifications that go to
> make success in their particular field.  And I think if you look over the records of the men
> who are taking these responsible positions at the heads of the companies grouped
> together you will find that they are U. G. I. men who have been in this organization, have
> standing, and have the ability to produce the results I have outlined.

*See* Blake Testimony at 36-37 and related exhibits.

      194.    President Thompson's 1928 discussion of the UGI policy of placing "UGI men"

as the heads of groups of properties was virtually identical to the UGI method of operation

discussed in the *Daily Philadelphia Stockholder* thirty-four years earlier.  *See* Blake Testimony

at 37 and related exhibits; Shifrin Testimony at 35 and related exhibits.

      195.    UGI used the Management Committee to manage and control its operations.

Examples of UGI exercising its control over the "Connecticut Properties" or "Connecticut

Companies" are contained in the UGI Management Committee minutes for 1927. *See* Blake Testimony at 37-38 and related exhibits (providing a list of examples).

196.    UGI used the Management Committee to manage and control the Connecticut Properties or Companies via CL&P, the intermediate subsidiary established by UGI management to hold the operating properties in Connecticut. Examples of UGI exercising its control over the "Connecticut Properties" or "Connecticut Companies" via CL&P are contained in the UGI Management Committee minutes for 1927, and other sources. *See* Blake Testimony at 39-45 and related exhibits (providing a list of examples).

197.    UGI was directly involved in the operations and gas distribution business of CL&P and the Connecticut MGPs beginning with Waterbury and Norwalk and then in 1917 with the initial acquisition of the Rocky River Power Company (subsequently merged with other companies and renamed CL&P). *See* Blake Testimony at 50-51.

198.    UGI had a "policy of supervising the operations of" its subsidiaries by "applying the U. G. I. system of supervision." UGI stressed that the fees it received were "purely secondary" to securing the ability to apply its "principles and methods." *See* Blake Testimony at 50 and related exhibits.

199.    Furthermore, UGI was the one to "seek such contracts," which is not consistent with UGI's claim that the Connecticut Companies came to UGI only for sporadic advice and consultation. UGI purchased the MGPs or acquired control through lease. UGI directed and supervised the MGPs itself or through intermediate holding companies, and its own President Thompson stated that this direction and supervision was not for consulting fees but rather to supervise the individual plants and realize a profit on its purchases. *See* Blake Testimony at 51.

**UGI Controlled The Operations of the Connecticut MGPs at Varying Times.  UGI's Operational Control of These MGPs Resulted in UGI Having Control Over The Management of Tar And Other Waste Products.**

200.    UGI President Thompson explained UGI's view of the reasons to consolidate and merge public utility companies in UGI's 1926 *Annual Report to the Stockholders* in a section entitled "Management Organization":

> Because of the advances in the art of rendering public service, namely transportation, light, heat and power, and as well as in the use of gas, for manufacturing and domestic purposes, there seems now, need for greater managing organizations which have the ability to organize systematic and economic handling of public utility companies in their local service as well as the consolidation and merger of companies where they make for greater economies and effect lower costs to patrons and provide better structures for financing.  Your company has a staff of men with long experience who have been successful in the lines of work for which they have been placed at the head and have been meeting the demands of the day in efficient management, welfare of employees and general building up of the properties to which they are sent to render service.

*See* Blake Testimony at 46 and related exhibits.

201.    Thompson concluded his discussion on the management organization of UGI with the statement that "[t]he policy of the directors of your Company [UGI] is to continue to provide Management-Engineering-Construction service to companies it controls."  *See* Blake Testimony at 46 and related exhibits.

202.    Some specific examples of UGI exercising operational control at the Connecticut MGPs that pertain to all MGPs, or groups of MGPs broadly, include the following:

- At the 1909 UGI Superintendents' Meeting tar and tar handling was a major topic of discussion.  Use "of tar and tar products" and "burning tar" was addressed.  UGI reported the "necessity of burning a certain amount of tar under boilers, and some Superintendents have had trouble from the overheating of the sheet over the fire and the tubes of their boilers."  There was discussion of tar "being successfully burned under coal gas benches."

- UGI's "Purchasing Department makes arrangements for a system company to sell its by-products produced in manufacturing gas" as necessary.

- On March 10, 1932, CL&P provided UGI with a schedule that UGI had requested showing purification box operation, including coal-gas and water-gas boxes at Waterbury, Norwalk, Winsted, Willimantic, and Putnam. CL&P noted that the purification box at Winsted was scheduled for change but CL&P would comply with UGI's request that the change be delayed until further notice from UGI.

- Subsequently, UGI informed CL&P it could change the Winsted box without a UGI engineer present as long as CL&P complied with stated procedures. UGI also notified CL&P it was preparing instructions for changing purifier boxes. It further asked that CL&P inform UGI prior to future purifier box changes so that a UGI engineer could be present to "go over the matter with your [CL&P's] men in full detail."

- In addition, in letters to the managers of the Winsted, Norwalk, Bristol, Meriden, Waterbury, Putnam, and the Rockville-Willimantic Gas Districts, CL&P informed those plants that UGI had requested that UGI be advised "prior to the opening of any purifying box in system" since UGI planned "to have a representative present at the time any box is changed."

- In April 1929, CL&P wrote to UGI', proposing to abandon and dispose of the manufacturing facilities at the Middletown and Bristol plants. CL&P requested UGI input. UGI rejected the proposal for Bristol because UGI was "running some additional tests on the production of low gravity carbureted water gas and it may just possibly be feasible to operate the Bristol plant for a certain period of the year for peak load house heating loads." UGI approved removal of certain facilities at the Meriden coal gas plant, such as "ammonia condensing and scrubbing and exhausters," and approved keeping the water gas plant at Meriden intact as CL&P had suggested previously.

- In January 1935, UGI wrote to CL&P to furnish details of "the extent of the holder inspections and subsequent recommendations made by our [UGI's] gas engineers at the time they make their yearly Works Inspection in a property." UGI noted that its engineers checked holder painting, holder heating, and "the amount of sediment in the cups," and also mentioned that "the quantity of tar and holder oil in the holders is discussed with the operators and if changes are desirable the necessary recommendations are made."

- In August 1937, UGI provided CL&P with an outline of the purging practices used in UGI's "various companies." UGI discussed the purging of holders, purifiers, scrubbers, condensers, wash boxes, and mains.

See Shifrin Testimony at 46-47 and related exhibits.

203.    In 1927, a "Works Inspection Report" memorialized an inspection at the Meriden (Cooper Street) MGP.  A virtually identical 1927 "Works Inspection Report" memorialized an inspection at the Norwalk MGP.   *See* Shifrin Testimony at 47 and related exhibits.

204.    These reports are form documents consistent with other similar UGI reports. They make internal references to other UGI departments.   They reference the use of wood pulp to stop holder leaks and reference the "Operating Notes for June 1914" which refer to the "UGI Engineering and Operating Notes." *See* Shifrin Testimony at 48 and related exhibits.

205.    Those UGI Operating Notes contain an article titled "Leaky Holder Pits."  The article discusses how to deal with leaky holders and specifically advises that they "can be treated with unbleached wood pulp…."  It mentions wood pulp in several other places.  *See* Shifrin Testimony at 48 and related exhibits.

206.    The Operating Notes were highly confidential UGI documents, entrusted to each plant superintendent, to be retained in a "special filing binder.""  The June, 1914 notes contain the same admonition.  Therefore, these inspection reports were referring to an internal, confidential UGI document as a reference.   *See* Shifrin Testimony at 36 and related exhibits.

207.    The foregoing facts demonstrate that these standardized inspection forms were UGI forms and that these Reports document UGI inspections of the Meriden and Norwalk MGPs.  *See* Shifrin Testimony at 47-48.

208.    The inspection reports provide a detailed insight into the manner in which UGI oversaw and directed the detailed operations of two specific MGPs.  *See* Shifrin Testimony at 47-49.

209.    These two inspection reports are consistent with similar UGI reports, thus supporting the assertion that UGI's approach to operational control was systemic. *See* Shifrin Testimony at 47.

210.    These inspection reports, coupled with other evidence, form the basis to extrapolate how UGI was exerting control over other Connecticut MGPs during the same period. *See* Shifrin Testimony at 47-48.

211.    UGI would have conducted similar inspections at all the Connecticut MGPs during this time period. Those inspections would likely have been conducted in a manner, and in the same level of detail, as the Meriden and Norwalk inspections. *See* Shifrin Testimony at 50.

212.    These reports link the detailed directives in the early Operating Notes to the inspection function 13 years later, and tie together many of the essential aspects of the mechanisms by which UGI exerted operational control (inspections and directives, detailed operational oversight, repairs, and centralized review). *See* Shifrin Testimony at 48 and related exhibits (citing a list of these inspection functions).

213.    Following a plant inspection, UGI understood all aspects of operations specific to each plant and would be in a position to impose specific controls either locally or remotely. *See* Shifrin Testimony at 50.

### UGI Control Of The Waterbury – North MGP

214.    In 1853, coal gas production began at the Waterbury-North MGP. In 1883, UGI installed a Lowe CWG facility, and CWG production began. Waterbury-North was one of UGI's first two Lowe CWG installations in the nation, receiving a major business investment from UGI of nearly $1 million in the first thirty years it controlled the site. *See* Shifrin Testimony at 50 and related exhibits.

215.    MGP operations ceased in 1928, but gas holders continued to be used for storage of gas produced at Waterbury-South until at least 1938.  The Waterbury-North MGP was demolished in 1964.  *See* Shifrin Testimony at 50 and related exhibits.

216.    This plant made 11.2 billion cubic feet of gas (45% under UGI) from 1854 to 1928, and almost 6 million gallons of tar (43% under UGI).   *See* Shifrin Testimony at 50 and related exhibits.

217.    UGI directly owned and operated the Waterbury-North facility for twelve years, from 1883 to 1895.  UGI operated the plant through a lease from 1884 to 1914.  *See* Shifrin Testimony at 51 and related exhibits; Blake Testimony at 18; Macey Testimony at 24.

218.    In the early 1900s,  UGI transferred the Waterbury lease to one of its subsidiaries, the Connecticut Lighting and Power Company (different from the later CL&P), "but the operation of The Waterbury Gas Light Company's property was continued under the supervision of The United Gas Improvement Company."  *See* Blake Testimony at 18 and related exhibits.

219.    UGI then controlled the operations of the facility through holding companies for an additional twelve years, from 1929 to 1941.  *See* Shifrin Testimony at 51 and related exhibits.

220.    UGI regained control in 1929 when the MGP was used for storage of gas made at the Waterbury – South MGP.  *See* Shifrin Testimony at 53 and related exhibits.

221.    As early as 1883, UGI was interested in acquiring the Waterbury Gas Light Company and implementing the Lowe water-gas process at its plant.  In May 1883, the minutes of the UGI Board of Directors rescinded a previous action which had authorized the purchase of "the majority of the stock of the Waterbury Gas Light Co." since it became apparent that this stock did "not carry with it a majority of the Board of Directors" of Waterbury.  At the same meeting, the UGI Board authorized the future purchase of the Waterbury Gas Light Company

"provided that the majority of the Board of Directors be secured at the same time." This language confirms that UGI was only interested in acquiring Waterbury North if it could secure enough stock to control the board of directors of the Waterbury Gas Light Company and thereby operate the company and gas plant according to its own patented gas production method (namely the Lowe process). *See* Blake Testimony at 21 and related exhibits.

222.    After UGI "purchased a controlling interest in the Waterbury Gas Light Co…with a view to securing the introduction of one of your [Lowe CWG] processes" in June 1883, UGI leased to operate the Waterbury Gas Light Company "at the sole cost and expense and for the sole profit and benefit of [UGI]…to make, distribute, sell and dispose of the gas and other products". With its acquisition in 1883, UGI converted the plant from coal gas to Lowe CWG, one of the first two UGI-constructed Lowe CWG plants. *See* Shifrin Testimony at 52 and related exhibits.

223.    On April 17, 1884, UGI signed the lease agreement. Under the terms of this lease, the Waterbury Gas Light Company would receive an annual rental fee. UGI received 2,000 shares of stock of the Waterbury Gas Light Company and an option to purchase the remaining stock of such company when the lease expired. If UGI did not exercise this option, it would forfeit the value of all plant improvement made during the ten-year lease. The Waterbury Gas Light Company also had an option to refuse to sell its stock to UGI and instead pay UGI for the improvements. *See* Blake Testimony at 21-22 and related exhibits.

224.    In March 1891, the UGI Managing Committee noted that UGI's lease on Waterbury North was set to expire on April 1, 1894 and that UGI would be obligated to either purchase all the stock of the Waterbury Gas Light Company at par or forfeit their improvements on the plant. In the event that the shareholders of the company declined to sell their stock, UGI

would be reimbursed for the improvements. After this discussion, the "General Manager was authorized to quickly purchase from time to time between now and April 1, 1894, as much of the capital stock of the Waterbury Gas Light company as can be obtained at any price below par." *See* Blake Testimony at 22 and related exhibits.

225.    On March 30, 1894, UGI and the Waterbury Gas Light Company agreed to extend the lease of the gas plant for another 20 years. According to this new lease agreement, UGI leased all of the Waterbury North "premises and property . . . with full right to occupy, use and operate the same under and for the purposes of this contract, but at the sole cost and expense and for the sole profit and benefit of the party of the second part [UGI] . . . to make, distribute, sell and dispose of the gas and other products, collect bills, improve, alter, repair, maintain, enlarge or extend the said gas works . . . and generally to do all things necessary or advisable in the judgment of the party of the second part [UGI] to conduct, continue and extend the business." *See* Blake Testimony at 22 and related exhibits.

226.    This agreement also served to settle all outstanding financial debts arising from the termination of the initial ten-year lease from 1884-1894, including a $140,000 payment by the Waterbury Gas Light Company (in the form of 5,600 shares of $25 par value stock) to reimburse UGI for all the improvements and extensions that UGI made to the gas plant during the term of the first lease. When the second lease expired in 1914, the Waterbury Gas Light Company would pay UGI for the value of all property improvements either in cash or stock. *See* Blake Testimony at 22 and related exhibits.

227.    UGI's control of the Waterbury North gas plant and operations through the lease was widely reported by third-party sources as well as UGI itself. In its 1884 *Annual Report to Stockholders*, UGI reported that its "Board purchased a controlling interest in the Waterbury Gas

Light Co. of Waterbury Conn., with a view to securing the introduction of one of your [UGI's] processes. This has been accomplished." *See* Blake Testimony at 23 and related exhibits.

228.    In 1896, a book written by J. Anderson about the town and city of Waterbury noted that "the entire management of the business [the Waterbury Gas Light Company] is in the hands of the United Gas Improvement company." This book also stated that UGI sent its own agent, Edwin H. Williams, to Waterbury North in 1883 "at the time of the reconstruction of the gas works" to become the plant superintendent. *See* Blake Testimony at 23 and related exhibits.

229.    UGI sent Williams to Waterbury North to operate the facility. *See* Shifrin Testimony at 51 and related exhibits.

230.    UGI and Mr. Williams signed an agreement in 1887 ensuring UGI that "all inventions and improvements relating to the manufacture, supply or distribution of light, heat or power from gas or electricity . . . made by said E. H. Williams . . . and all letters patent which are or may be granted therefore, and applications therefore, shall be assigned to said United Gas Improvement Company whenever desired by it." Although Mr. Williams was technically employed by Waterbury North at this time, according to the book employees of the local company were perceived as agents of UGI. *See* Blake Testimony at 23 and related exhibits.

231.    Further evidence of UGI's controlling presence at Waterbury North comes from the fact that UGI held itself out as the owner and operator of the plant. In numerous editions of Waterbury Directory[2] from 1883 through 1914, UGI's name shows up in whole or in part as the company controlling the gas plant in Waterbury. Examples include:

---

[2] These city directories listed businesses and individuals names and addresses and are akin to today's telephone books.

- The 1883 directory listed the Waterbury Gas Light Co.'s address as 69 Bank, but by 1884 (the year during which UGI began its lease of the Waterbury gas plant) UGI had replaced the Waterbury Gas Light Co. as the gas company listed at that address.
- The 1902 directory (among many others) provided a description saying that UGI "mfrs. [manufactures] gas" in Waterbury.
- UGI published advertisements promoting its gas business in Waterbury. By 1915 (after UGI's lease ended), the Waterbury Gas Light Company instead was placing advertisements.
- UGI was listed as the only gas company in Waterbury in the 1913 directory and its address was listed as 83 Center. However, by the time the succeeding directory was published in 1914 the Waterbury Gas Light Co. was the only gas company listed, replacing UGI at 83 Center.

*See* Blake Testimony at 23-24 and related exhibits.

232.    UGI included its own name in the title when referring to the gas plant being leased from the Waterbury Gas Light Company. For instance, UGI Executive Committee minutes in 1911 that tracked monthly advertising and promotion expenditures reflected the advertising expenses for "U.G.I. Company, Waterbury," and a section on salaries for personnel at UGI and various companies lists "U.G.I. Co., Waterbury" separately in connection with the salary levels and budgets for salaries and for various employees and positions at that specific plant. The Executive Committee minutes from 1913 included a table listing the dates of most recent audits at subsidiary companies which showed "Waterbury, Conn., The U.G.I. Co." as having been audited on April 30, 1912 and also included a table of the "limits of expenditures for repairs without formal authorization" which included "The U.G.I. Co., Waterbury, Conn." with a limit of $75. *See* Blake Testimony at 24 and related exhibits; Macey Testimony at 25 and related exhibits.

233.    On September 10, 1901, Thomas Dolan, President of UGI, acknowledged in a letter that UGI "controls, by lease, the Waterbury Gas Light Company." *See* Macey Testimony at 25.

234.    UGI constructed, maintained, and repaired much of the plant's equipment, purchased raw materials, and sold/disposed of gas and byproducts.  During UGI's tenure, annual gas production rose from ~60 million cubic feet to 380 million cubic feet.  *See* Shifrin Testimony at 51-52 and related exhibits.

235.    Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure.  Some of this equipment had tar in it and/or was designed to handle wastes or byproducts.  *See* Shifrin Testimony at 52 and related exhibits; Exhibit 13.

236.    Between 1883-1914, UGI installed/inspected equipment, directed MGP operations, approved contracts for gas-making materials, and made plant repairs/upgrades. There are numerous specific examples of UGI control.  *See* Shifrin Testimony at 52-53 and related exhibits.

237.    UGI personnel made both major and minor operating decisions with respect to Waterbury North.  Numerous examples of the detailed decisions made by the Managing and Executive Committees of the UGI Board of Directors concerning the operation of Waterbury North's gas manufacturing and related processes are contained in the Testimony of Thomas Blake.  *See* Blake Testimony at 25-27 and related exhibits (listing specific examples).

238.    On May 3, 1915, the UGI president noted to the Board of Directors that "the Waterbury Gas Light Company was for many years operated by The United Gas Improvement Company as Lessee, first on its own account, and subsequently for account of the Connecticut Railway and Lighting Company and The New York, New Haven and Hartford Railroad Company."  The *U.G.I. Circle* confirmed this by noting that "[f]rom 1901 to 1914 U. G. I. operated The Waterbury Gas Light Company for the benefit of C. R. & L. and its lessees."  *See* Blake Testimony at 24-25 and related exhibits.

239.    The current Waterbury-North MGP site is located at the intersection of Jackson (Race) Street and Interstate 84 in Waterbury, Connecticut.  It sits on approximately 6.5 acres of land and abuts the Naugatuck River to the south and west.  The 6.5-acre site slopes west to the Naugatuck River with groundwater at 15-20 feet below ground surface flowing toward the river in fill, sand, and gravels with no distinguishable confining layer down to bedrock at 40-110 feet below ground surface.  Data from approximately 100 borings define roughly 1.1 acres of NAPL at this site with liquid tar as shallow as 6 feet below ground surface and the NAPL's vertical extent and volume undefined.  This NAPL was released from Holders 1 and 3 as well as from a suspected tar lagoon near the river.  Tar is likely to still be migrating into river sediments. Contaminated groundwater at downgradient boundaries has tar constituents such as total PAHs (polycyclic aromatic hydrocarbons) as high as 360 µg/L and naphthalene as high as 210 µg/L. *See* Shifrin Testimony at 51 and related exhibits.

240.    The 1988 Site Investigation (SI) showed significant and widespread NAPL.  The majority of NAPL (primarily tar) was observed within, beneath, and surrounding UGI-operated No. 1 gasholder and No. 3 gasholder (both having brick masonry pits to 20 feet below ground surface), as well as in an area near the river bank (a possible tar lagoon) that is migrating into the Naugatuck River.  Significant LNAPL contamination, described as fuel oil, was observed in several borings near/along Jackson Street at depths from ~15-25 feet below ground surface.  The source of this LNAPL is unknown.  *See* Shifrin Testimony at 52 and related exhibits.

241.    The contamination at this site correlates with the UGI-controlled equipment.  *See* Shifrin Testimony at 53; Exhibit 14.

242.    The evidence shows that both from an operational and from a corporate governance perspective there was no separation between UGI and the Waterbury Gas Light Company.  *See* Macey Testimony at 25.

243.    UGI operated the Waterbury-North MGP from 1884 to 1914, and from 1929 to 1941.  *See* Shifrin Testimony at 51; Blake Testimony at 27 and related exhibits.

### UGI Control of the Waterbury – South MGP

244.    Coal gas production began at the Waterbury-South site around 1918.  CWG production began in 1928.  The coal gas plant was later decommissioned in 1935.  MGP operations continued until 1963.  The MGP, including two gas balls, was demolished over time, between 1964 and the 1970s.  *See* Shifrin Testimony at 54 and related exhibits.

245.    This plant made 22.9 billion cubic feet of gas (39% under UGI) from circa 1918 to 1963.  The plant also made 14.3 million gallons of tar byproduct (39% under UGI).  *See* Shifrin Testimony at 54 and related exhibits.

246.    The *New York Times* reported in July 1929 that UGI acquired the Waterbury Gas Light Company through the purchase of a controlling interest of its stock.  UGI accomplished this acquisition by having the Connecticut Electric Service Company acquire 105,600 shares of The Waterbury Gas Light Company in exchange for 52,800 shares of Service Company common stock.  Thus, the Waterbury Gas Light Company became an indirect subsidiary of UGI.  The Waterbury Gas Light Company was merged into CL&P in 1931.  UGI controlled the Site until 1941.  *See* Blake Testimony at 19 and related exhibits.

247.    The location of the Waterbury-South MGP site is at 47 Eagle Street in Waterbury, Connecticut. It sits on 30.8 acres.   The site abuts the Naugatuck River to east.  Data from about 250 borings and 50 wells define the horizontal and vertical extent of NAPL at this site with

liquid tar detected primarily between 2 and 16 feet below ground surface, but extending as deep as 97 feet below ground surface. The volume of NAPL in the subsurface has not been estimated. This NAPL was likely released from the relief holders, a 2 million cubic foot gas holder, and from tar tanks, separators, stills, and condensers. Tar is likely to still be migrating into river sediments. Contaminated groundwater at downgradient boundaries has tar constituents such as total PAHs as high as 620 µg/L and naphthalene as high as 310 µg/L. Through 2006, 91,000 and 16,000 tons of soil and debris, respectively, as well as 113,000 gallons of tar/water were removed from tar source areas and liquefied natural gas facility construction areas. *See* Shifrin Testimony at 54-55 and related exhibits.

248.    The majority of tar was observed around and downgradient of the 2 million cubic feet gasholder (installed and operated by UGI), 2 relief holders, purifiers, tar condensers, and the tar tanks/tar stills area (all operated by UGI except for 1 relief holder). Scattered, shallow NAPL observations at locations distal from MGP equipment (north and south ends of the site) may be due to soil filling/re-working during MGP operations. *See* Shifrin Testimony at 55 and related exhibits.

249.    The Waterbury – South MGP was a relatively large plant (>900 million cubic feet gas produced annually by 1930), initially producing only coal gas, then CWG after Lowe CWG sets were installed by UGI in 1928. UGI installed new equipment from 1929-1941. *See* Shifrin Testimony at 55 and related exhibits.

250.    Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure. Some of this equipment had tar in it and/or was designed to handle wastes or byproducts. *See* Shifrin Testimony at 55 and related exhibits; Exhibit 15.

251.    There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin.  *See* Shifrin Testimony at 55-56 (listing specific facts demonstrating control); Blake Testimony at 54-55 (listing specific facts demonstrating control).

252.    The contamination at this site correlates with the UGI-controlled equipment.  *See* Shifrin Testimony at 56; Exhibit 16.

253.    UGI operated the Waterbury-South MGP from 1929 to 1941.  *See* Shifrin Testimony at 56; Blake Testimony at 56-57.

## UGI Control of the Waterbury – Benedict Street MGP

254.    Oil gas production began at the Waterbury – Benedict Street MGP site around 1879 and continued through approximately 1884.  The MGP was demolished over time between 1884 and 1893.  In 1890, MGP sheds were not present and other MGP structures were not in use.  In 1895, the former MGP site came to be used by Tracy Bros. Lumber Co.  This MGP made an unknown amount of gas and tar byproduct between 1879 and 1884.  *See* Shifrin Testimony at 56 and related exhibits.

255.    In 1884, UGI leased the plant in order to operate it, but closed the plant soon after on an unknown date and demolished all plant structures between 1890 and 1895.  *See* Shifrin Testimony at 56 and related exhibits.

256.    The location of this site is at Benedict Street in Waterbury, Connecticut.  It is 0.25 acres.  The Naugatuck River is approximately 1,000 feet to the south and Great Brook is located approximately 120 feet to the west.  *See* Shifrin Testimony at 57 and related exhibits.

257.    Although UGI did not operate the Waterbury-Benedict Street MGP to manufacture gas, it did operate and control the plant during a period when contamination likely continued to discharge to the environment.  UGI operated the Waterbury-Benedict Street MGP

from beginning in 1884, and then demolished all plant structures between 1890 and 1895. The amount of UGI's responsibility or allocation is for a later phase in this case. *See* Shifrin Testimony at 57.

### UGI's Control of the Norwalk MGP

258.    Coal gas production began at the Norwalk MGP in 1856. UGI first installed its Lowe CWG set in 1911, and CWG production began. The production of coal gas ceased in 1919. In about 1933, a former tar pond on site was abandoned and filled. MGP operations ceased in 1960 and the MGP was later demolished. Plant demolition was mostly completed in 1963, but 2 remaining holders were removed in 2003. *See* Shifrin Testimony at 57 and related exhibits.

259.    This plant made 13.9 billion cubic feet of gas (54% under UGI) from 1856 to 1960. The plant also made 11.2 million gallons of tar byproduct (42% under UGI). *See* Shifrin Testimony at 57 and related exhibits.

260.    UGI acquired the Connecticut Lighting and Power Company, which owned the Norwalk Gas Light Company, in 1899 or early 1900 (a May 7, 1900 UGI letter to stockholders confirmed the acquisition of Connecticut Lighting and Power, which at the time had already acquired the Norwalk Gas Light Company, but an exact date of UGI's acquisition of Connecticut Lighting and Power was unavailable). As a result, UGI controlled Norwalk through the Connecticut Lighting and Power Company. In 1901, the Connecticut Lighting and Power Company changed its name to the Connecticut Railway and Lighting Company, and UGI subsequently controlled Norwalk through CR&L. *See* Blake Testimony at 19 and related exhibits; Shifrin Testimony at 58.

261.    In the May 7, 1900 UGI President's *Annual Report to Stockholders*, President Dolan reported that UGI's "business has steadily continued by the extension of the properties at that time owned and controlled, and by the acquisition of new properties. . . . In the State of Connecticut we [UGI] have acquired a controlling interest in . . . The Connecticut Lighting and Power Company, which owns . . . the Norwalk Gas Light Company." *See* Blake Testimony at 27-28 and related exhibits.

262.    In 1906, Norwalk was leased by CR&L to The Consolidated Railway Company ("ConRail" – not the same as today's ConRail).  After ConRail became the New York New Haven Hartford Rail Company ("NYNHHRC"), the Norwalk lease was transferred to Housatonic and later to The United Electric Light and Water ("UEL&W") under a 994-year lease.  *See* Blake Testimony at 28-29 and related exhibits.

263.    A *New York Times* article states that UEL&W was "understood to represent the United Gas Improvement Company."  Further indicating some type of relationship between UGI and UEL&W was the fact that UGI had an "option to purchase the property of The United Electric Light & Water Company," which it exercised in 1916.  *See* Blake Testimony at 29 and related exhibits.

264.    The current site of the Norwalk MGP is located at 11 Harbor Avenue in Norwalk, Connecticut.  The 6.7-acre site (divided into 3 parcels from east to west – Parcels A, B, and C) slopes east to the Norwalk River with tidally-influenced groundwater at 5-25 feet below ground surface flowing toward the river in fill, sand/gravels, and silt/peat at a hydraulic conductivity of $10^{-3}$ to $10^{-5}$ cm/s.  A locally confining silt/peat layer is present at 10-13 feet below ground surface in Parcel A.  Data from about 106 borings, 15 wells, and 3 test pits generally define the horizontal and vertical extent of NAPL in Parcel A and the southern half of Parcel B with liquid

tar detected primarily between 4 and 13 feet below ground surface in the location of a former tar

pond in Parcel A that operated from an unknown date to circa 1933. Very limited investigation

has occurred in the northern half of Parcel B or Parcel C. NAPL was likely released from a

100,000 cubic foot gas holder, a tar vat (Parcel B) and from the tar pond. Investigations to date

have not revealed any ongoing tar migration into river sediments. Contaminated groundwater at

downgradient boundaries has tar constituents such as total PAHs as high as 48 µg/L and

naphthalene as high as 11 µg/L. Through 1994, 8,700 tons of soil, tar, and debris were removed

from tar source areas in Parcel B. No remedial work has been completed in Parcels A or C. *See*

*Shifrin Testimony* at 58 and related exhibits.

265.    During UGI's tenure, annual gas output increased more than 10-fold, from 20

million cubic feet to more than 200 million cubic feet. Historical documents and limited

environmental studies show significant tar contamination in Parcel A soils, southern Parcel B

soils, and Norwalk River sediment. Major tar sources include the former tar pond (Parcel A), the

100,000 cubic foot gasholder and tar vat (southern Parcel B), all of which were operated by UGI.

Southern Parcel B was remediated in 1994 to prepare for the construction of a Yankee Gas

service center. *See* Shifrin Testimony at 59 and related exhibits.

266.    B. V. Pfeiffer of UGI wrote a letter to UGI gas engineer J. A. Perry on

September 8, 1926 summarizing his visit to the gas plant at Norwalk and his analysis of "the

complaints of tar and oil going into the Norwalk River." Pfeiffer went on to say that "when the

tide in the river was going out that considerable tar and oil was flowing into the river," and he

also provided an explanation of how it happened. Pfeiffer further mentioned that he had given

technical instructions for trying to fix the problem, and he suggested that they determine the

amount of tar that could be sold and secure bids "through the Waterbury Purchasing Department

for its sale." Later in the same letter, Pfeiffer mentions that two men at Norwalk brought up "an additional light delivery truck to take care of a great amount of shop work that has been accumulating for the past four months. This truck has been requisitioned for several months ago, but has not been authorized to date. Unless this truck is secured shop orders such as 'gradual cease to record' 'non-registering meters' and 'changing meters for 5 year Tests' will not receive the prompt attention necessary to promote good and efficient operation of the shop." *See* Shifrin Testimony at 59 and related exhibits; Blake Testimony at 29-30 and related exhibits.

267.    The Norwalk MGP needed UGI's approval to purchase the truck. These were not recommendations by Mr. Pfeiffer. The plain language used ("I instructed Mr. Milne and Mr. Price to remedy these conditions immediately") demonstrates that this was more than a suggestion. *See* Blake Testimony at 30 and related exhibits.

268.    Instructing the local plant operators to remedy a condition "immediately" and giving specific step-by-step instructions on how to do so is not consistent with simply providing advice or services in the role of a consultant, employee, or investor. Instead, it is an order from the operating management to the local plant employees to take specific actions related to the operation of an MGP and is an example of UGI supervising and directing the operations of the MGP and the waste management at the MGP. *See* Blake Testimony at 30.

269.    On March 7, 1927, B. V. Pfeiffer of UGI wrote a follow-up letter to J. A. Perry of UGI including the report of his visit to Norwalk regarding "the tar situation at the gas plant." The report includes various technical descriptions, problems, and solutions. The letter was a six-month follow-up on the problems Pfeiffer previously reported in the September 8, 1926 letter discussed above and was titled "Tar situation at Norwalk Conn." It began with Pfeiffer reporting

that he visited the plant "and went over the tar situation at the gas plant with Mr. Milne and Mr. Price" and reported the following:

> The present tar separator is very dirty and working inefficiently and it was decided to clean the separator immediately. . . .

> The cleaning of this separator will put it in proper working condition and should eliminate any tar and oil from passing the tar separator into the coke filter beds as is now the case. . . .

> At the time of my visit, the operators were running clear water into the 'blow back' and into the tar extractor. I explained to Mr. Price and Mr. Milne that this is not necessary and recommended to discontinue this practice immediately and thereby eliminate any excess clear water from entering the tar separator from this source.

> The condenser on the outlet of the water gas machines is in need of retubing. These tubes have been ordered and are expected to be received within the next month at which time this condenser will be retubed. At the present time this condenser is by-passed and the operators believed it was necessary to make other arrangements to assist them in cooling the gas as it left the water gas machines. . . . I explained to the local operators that this was a very inefficient way of securing the necessary condensing and instructed them to discontinue this practice immediately. . . .

> I again instructed Mr. Price to secure several samples of tar, say, at 1' depths starting at the bottom of his relief holder and have these tested for moisture. After these tests have been made a further study as to the best method of handling the tar now stored in the relief holder should be made and some system of tar dehydration should be installed. I believe at this time the simplest method of dehydrating the tar that is being made, as well as the tar that is stored in the relief holder would be to recover the 6,000 gallon oil tank now buried in the yard and erect this tank as a tar dehydrator. I would also empty and clean the 16,000 gallon vertical oil storage tank and convert this into a dry tar storage tank. . . .

> In the operation of these tanks, tar is to be heated in the 6,000 gallon tank under pressure to approximately 20 to 30 pounds for a definite length of time depending on the moisture in the tar. After the tar is under 2% moisture, it is drained from the 6,000 gallon tank into the 16,000 gallon tank for final storage before shipment. Such tar as is recovered from the separator is to be pumped daily into the 6,000 gallon tank and after a batch of 3000 to 4000 gallons is accumulated the tar may be treated in the manner explained above. . . .

> The water accumulating in the 6,000 gallon tank after treating the tar should be drained into the outlet of the present tar separator.

> I am attaching hereto two sketches showing my recommendations as set forth above.

*See* Blake Testimony at 30-31 and related exhibits.

270.    On March 21, 1927,  J.E. King, Supervisor of Operations for CL&P, wrote to A.J. Campbell, General Superintendent for CL&P, to confirm that "the operation is now exactly in accordance with Mr. Pfeiffer's wishes" (emphasis added).  *See* Blake Testimony at 31-32; Shifrin Testimony at 60.

271.    The fact that CL&P management would follow up and report that operations were "now exactly in accordance with Mr. Pfeiffer's wishes" is instructive as to the power and control that UGI exercised over both CL&P and the local managers at the MGPs.  *See* Blake Testimony at 32.

272.    Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure.  Some of this equipment had tar in it and/or was designed to handle wastes or byproducts.  *See* Shifrin Testimony at 59; Exhibit 17.

273.    Between 1899-1941, UGI installed/inspected equipment, directed MGP operations, approved contracts for gas-making materials and plant repairs/upgrades, provided instructions, and provided direct input on contamination issues.  *See* Shifrin Testimony at 61 and related exhibits.

274.    There are numerous specific examples of UGI control cited in the Testimony of Neil Shifrin and Thomas Blake.  *See* Shifrin Testimony at 59-61 and related exhibits; Blake Testimony at 32-33 and related exhibits.

275.    The contamination at this site correlates with the UGI-controlled equipment.  *See* Shifrin Testimony at 61; Exhibit 18.

276.    UGI operated the Norwalk MGP from 1899 to 1941.  *See* Shifrin Testimony at 61; Blake Testimony at 34.

**UGI's Control of the Meriden – Cooper Street MGP**

277.    Coal gas production occurred at the Meriden – Cooper Street site from 1873 to 1928.  CWG production occurred from 1906 until 1928.  Gas holder number one was demolished in 1935   The second gas holder was demolished in 1963.  *See* Shifrin Testimony at 61 and related exhibits.

278.    This plant made 6 billion cubic feet of gas (24% under UGI) from 1874 to 1928. The plant also made 5 million gallons of tar byproduct (28% under UGI).  *See* Shifrin Testimony at 61-62 and related exhibits.

279.    UGI owned the plant directly in 1924, and then *via* CL&P since its acquisition in 1926. It held the site until 1941.  *See* Shifrin Testimony at 62 and related exhibits.

280.    In 1924, UGI acquired stock of the Meriden Gas Light Company and the Meriden Electric Light Company and sold it to the Syndicate, UGI's 80% owned subsidiary.  The Syndicate in turn sold the stock to its 100% owned subsidiary the Service Company.   In March 1926, the Service Company caused a merger between the Meriden Gas Light Company, the Meriden Electric Light Company, and CL&P, the Service Company's wholly owned subsidiary. UGI retained its interest in the Meriden sites until 1941, when it disposed of its interest in CL&P. *See* Macey at 27-28 and related exhibits.

281.    The location of this site is at 56 Cooper Street in Meriden, Connecticut.  It is 10.4 acres. Pilgrims Harbor Brook flows south through the site and then turns to the west.   The site is relatively flat with groundwater at 3-16 feet below ground surface flowing west in sand and gravel containing some silt.  A possible confining layer is limited to the western portion of the site where there is silty clay between 1-20 feet below ground surface.  Presumed bedrock (refusal) occurred at 45-70 feet below ground surface.  Pilgrims Harbor Brook flows south

through the site, then turns west. Data from 81 borings, 12 test pits, and 14 sediment samples found DNAPL impacts: 1) associated with Gas Holder No. 1 (10-20 feet below ground surface within/adjacent to, but up to 35 feet below ground surface west of holder); 2) beneath the retort house (2-13 feet below ground surface); 3) proximate to Drip Well No. 1 (1-8 feet below ground surface); and 4) in Pilgrims Harbor Brook surficial sediments (0-6 feet below sediments). Groundwater at downgradient boundaries has not been affected by tar constituents (*i.e.*, total PAHs, benzene, and naphthalene were not detected). Limited MGP-related remedial action has been completed to date: in 2005, the top 2 feet of soil from the former hortonsphere area was excavated because of benzo(a)pyrene exceedances (~37 mg/kg) of Connecticut standards. The uncompleted 2006 remedial action plan requires excavation of soils above the groundwater table (~5 feet below ground surface) near former Gas Holder No. 1, Drip Well No. 1, and the area west of fueling operations; installation of a soil vapor extraction system in the abandoned UST/gasoline tank area; and excavation of the top 4 feet of sediment in ~500 feet long stretch of Pilgrims Harbor Brook. *See* Shifrin Testimony at 62-63 and related exhibits.

282.    Studies show DNAPL impacts are: 1) associated with Gas Holder No. 1 (10-20 feet below ground surface within/adjacent to, but up to 35 feet below ground surface west of retort house); 2) beneath retort house (2-13 feet below ground surface); 3) proximate to Drip Well No. 1 (1-8 feet below ground surface); and 4) in Pilgrims Harbor Brook surface sediments (0-6 feet below surface sediment). *See* Shifrin Testimony at 63 and related exhibits.

283.    Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure. Some of this equipment had tar in it and/or was designed to handle wastes or byproducts. *See* Shifrin Testimony at 64; Exhibit 19.

284.    There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin.  *See* Shifrin Testimony at 63-64; (listing specific facts demonstrating control); Blake Testimony at 51-52 (listing specific facts demonstrating control)

285.    The contamination at this site correlates with the UGI-controlled equipment.  *See* Shifrin Testimony at 64; Exhibit 20.

286.    UGI operated the Meriden –Copper Street MGP from 1924 to 1941. *See* Shifrin Testimony at 64; Blake Testimony at 56-57.

### UGI's Control of The Meriden – South Colony Street MGP

287.    Coal gas was produced at the Meriden – South Colony street site between 1863 and 1873.  In 1873, the MGP operations at this site were switched over to the Cooper Street site. The gas holder was demolished in 1901 or 1902.  *See* Shifrin Testimony at 64 and related exhibits.

288.    This MGP made 50 million cubic feet of gas from 1863 to 1873.  It also made 50,000 gallons of tar byproduct. *See* Shifrin Testimony at 64 and related exhibits.

289.    UGI owned the site directly in 1924, and then via CL&P since its acquisition in 1926.  *See* Shifrin Testimony at 65 and related exhibits.

290.    The location of this site is at the northeast intersection of Cooper Street and Cooke Avenue in Meriden, Connecticut.  The site sits on approximately eleven acres.  The site is relatively flat; Pilgrims Harbor Brook flows south along the eastern site border.  *See* Shifrin Testimony at 65 and related exhibits.

291.    Exhibit 21 shows former MGP equipment.  MGP operations and demolition preceded UGI involvement at this site.  *See* Shifrin Testimony at 65 and related exhibit.

292.    Although UGI did not operate the Meriden – South Colony Street MGP to manufacture gas, it did operate and control the plant during a period when contamination likely continued to discharge to the environment.  The amount of UGI's responsibility or allocation is for a later phase in this case.  *See* Shifrin Testimony at 65.

## UGI's Control of the Winsted – Gay Street MGP

293.    Coal gas was produced at this site between 1874 and 1888.  CWG was produced between 1889 and 1953.  Gas holders numbered one and two were removed between 1947 and 1961.  The third gas holder was removed in 1979.  *See* Shifrin Testimony at 66 and related exhibits.

294.    This plant made 3 billion cubic feet of gas (31% under UGI) from 1874 to 1953.  The plant also made 8 million gallons of tar byproduct (30% under UGI).  *See* Shifrin Testimony at 66 and related exhibits.

295.    In 1929, 19,990 shares of common stock of The Winsted Gas Company "were purchased from independent and unrelated stockholders" by the Connecticut Electric Service Company in exchange for cash.  Another 10 shares were acquired for cash in 1930, giving the Service Company control of all 20,000 shares of Winsted.  Winsted merged into CL&P in 1931.  *See* Blake Testimony at 20 and related exhibits.

296.    The location of the Gay Street site is at the southeast corner of Case Avenue and Gay Street in Winsted, Connecticut.  It is 3.4 acres in size.  There is a small brook that runs through the site, which then runs into the Mad River immediately south of the site.  The Mad River then feeds Still River 300 feet south of the site.  The 3.4-acre site is flat.  Groundwater at 3-5 feet below ground surface flows south at 1-1,200 feet/yr (highest velocity is in the shallow aquifer) in fill, sand, gravel, and silt with no distinguishable confining layer down to bedrock at

35-50 feet below ground surface. Data from 100 borings define DNAPL, which exists primarily in the northern end of the property beneath former Gas Holders No. 1 and 2 and former tar handling equipment (5-20 feet below ground surface). Contaminated groundwater at downgradient boundaries has tar constituents such as total PAHs as high as 910 μg/L, naphthalene as high as 910 μg/L, and benzene up to 700 μg/L. No known remedies have been completed. *See* Shifrin Testimony at 66 and related exhibits.

297.    Environmental studies have revealed the presence of tar near and beneath UGI-controlled equipment, including Gas Holders 1 and 2, and tar recovery equipment. There are documented contamination-related incidents during UGI's control period, including gas holder emulsion formation and tar discharges to a nearby brook. *See* Shifrin Testimony at 67 and related exhibits.

298.    Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure. Some of this equipment had tar in it and/or was designed to handle wastes or byproducts. *See* Shifrin Testimony at 67; Exhibit 22.

299.    There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin. *See* Shifrin Testimony at 67 and related exhibits (listing specific facts demonstrating control); Blake Testimony at 55 and related exhibits (listing specific facts demonstrating control).

300.    The contamination at this site correlates with the UGI-controlled equipment. *See* Shifrin Testimony at 67; Exhibit 23.

301.    UGI operated the Winsted- Gay Street MGP from 1929 to 1941. *See* Shifrin Testimony at 67 and related exhibits; Blake Testimony at 56-57.

**UGI's Control of the Winsted – Prospect Street MGP**

302.     Resin and coal gas was produced at this site between 1861 and 1874.  The gas plant was demolished between 1874 and 1887.  This plant made 28 million cubic feet of gas from 1861 to 1874.  The plant also made 28,000 gallons of tar byproduct.  *See* Shifrin Testimony at 68 and related exhibits.

303.     UGI owned a controlling interest via Connecticut Electric Service Co. ("Service", owned 60% by UGI) when it acquired the site in 1929, and then via CL&P since its acquisition in 1931.  The Winsted Gas Co. was controlled by UGI through the Connecticut Electric Service Company from 1929-1931, and by CL&P from 1931-1941.  Based on available information, MGP operations and demolition preceded UGI involvement in Winsted.  *See* Shifrin Testimony at 68 and related exhibits.

304.     The location of this site is north of Prospect Street between Birdsall Street and Pratt Street in Winsted, Connecticut.  The site is 0.4-acre; the Mad River is adjacent to the north.  *See* Shifrin Testimony at 68 and related exhibits.

305.     Although UGI did not operate the Winsted-Prospect Street MGP to manufacture gas, it did operate and control the plant during a period when contamination likely continued to discharge to the environment.  The amount of UGI's responsibility or allocation is for a later phase in this case.  *See* Shifrin Testimony at 69.

**UGI's Control of the Rockville MGP Site**

306.     Coal gas was produced at the Rockville site between 1863 and 1889.  CWG was produced between 1889 and 1929.  Gas holders numbered one and two were removed from the site between 1928 and 1934.  The MGP was inactive beginning in 1930.  The facility was later

used exclusively as a substation, between 1935 and 1992. *See* Shifrin Testimony at 69 and related exhibits.

307.    This plant made 0.7 billion cubic feet of gas from 1863 to 1929. The plant also made 0.5 million gallons of tar byproduct. *See* Shifrin Testimony at 69 and related exhibits

308.    UGI owned a controlling interest *via* Connecticut Electric Service Co. ("Service", owned 60% by UGI) when it acquired the plant in 1930. *See* Shifrin Testimony at 69 and related exhibits.

309.    In 1930, the Service Company acquired 34,180 shares of the Rockville-Willimantic Lighting Company in exchange for 25,000 shares of the Service Company stock. In 1935, the Rockville-Willimantic Lighting Company merged into CL&P. UGI controlled the site until 1941. *See* Blake Testimony at 21 and related exhibits.

310.    The location of this site is at the northwest corner of West Main Street and Maple Street in Rockville, Connecticut. The size of the property is 3.5 acres. The property is adjacent to the Hockanum River on its south side. The site gently slopes from the northeast to the southwest (~20 feet elevation difference). Groundwater is at 3-27 feet below ground surface and flows north (*i.e.*, away from the Hockanum River at the southern site boundary) at 13 to 1,900 feet/yr in till and fill with no continuous confining layer down to bedrock at 28-84 feet below ground surface. Data from about 100 borings define deep "creosote impacts" (<8 feet thick, ~22 feet below ground surface) at the north and east site boundaries. Adjacent to these areas are offsite "creosote" deposits (2-7 feet thick, 20-37 feet below ground surface). Contaminated groundwater at downgradient boundaries has tar constituents such as total PAHs up to 117 µg/L and naphthalene as high as 8 µg/L. No known remedies have been completed. *See* Shifrin Testimony at 70 and related exhibits.

311.    The Rockville MGP ceased gas production in 1930, the same year UGI acquired the plant via Connecticut Electric Service Company.  Gas Holders No. 1 & 2 were demolished during UGI's tenure.  Site investigations show deep "creosote impacts" in the north and east sections of the site.  *See* Shifrin Testimony at 70 and related exhibits.

312.    Various pieces of gas making and/or tar handling equipment were present during UGI's tenure.  *See* Shifrin Testimony at 70 and related exhibits; Exhibit 24.

313.    There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin.  *See* Shifrin Testimony at 70-71 and related exhibits (listing specific facts demonstrating control); Blake Testimony at 55.

314.    The contamination at this site correlates with the UGI-controlled equipment.  *See* Shifrin Testimony at 71; Exhibit 25.

315.    UGI operated the Rockville MGP site from 1930 to 1941.  *See* Shifrin Testimony at 71 and related exhibits; Blake Testimony at 56-57.

### UGI's Control of the Willimantic MGP Site

316.    Coal gas was produced at the Willimantic site between 1859 and 1886, and then again between 1903 and 1929.  CWG was produced between 1886 and 1907, and later again between 1909 and 1953.  The MGP was demolished between 1953 and 1960.  *See* Shifrin Testimony at 71 and related exhibits.

317.    This plant made 2 billion cubic feet of gas (22% under UGI) from 1859 to 1953.  The plant also made 1.2 million gallons of tar byproduct (20% under UGI).    *See* Shifrin Testimony at 71 and related exhibits.

318.    UGI owned a controlling interest *via* Connecticut Electric Service Co. ("Service", owned 60% by UGI) when it acquired the plant in 1930.  *See* Shifrin Testimony at 71 and related exhibits.

319.    In 1930, the Service Company acquired 34,180 shares of the Rockville-Willimantic Lighting Company in exchange for 25,000 shares of the Service Company stock.  In 1935, the Rockville-Willimantic Lighting Company merged into CL&P.  UGI controlled the site until 1941.  *See* Blake Testimony at 21 and related exhibits.

320.    The location of this site is on the southwest corner of Riverside Drive and Jackson Street in Willimantic, Connecticut.  The site is comprised of 6.9 acres total.   The land is split by the Willimantic into north and south parcels.  The north parcel is 2.7 acres and the south is 4.2 acres.  The former MGP was limited to the north parcel, and the environmental investigations were limited to the north parcel and the adjacent river.  *See* Shifrin Testimony at 72 and related exhibits.

321.    The Willimantic River bisects the 6.9-acre site northwest/southeast; former MGP operations occurred on the 2.7-acre northern parcel ("MGP Parcel").   The MGP parcel slopes south to the river with groundwater at ~10 feet below ground surface flowing south and west toward the river in sand and gravel.  There is no distinguishable confining layer above the cracked bedrock at 15 feet below ground surface.  Data from about 100 borings and 10 sediment samples found the most extensive DNAPL contamination seeping through the cracks in the retaining wall and bedrock fissures at the river boundary of the MGP Parcel (8-12 feet below ground surface).  The source of this tar is not known.  Smaller areas of contamination were found near former tar storage tanks and within/near former Gas Holders No. 1, 2 and 3 (up to 12 feet below ground surface).  Contaminated groundwater at downgradient boundaries has tar

constituents such as total PAHs up to 3 μg/L; naphthalene and benzene were not detected. A newspaper article indicated an interceptor trench and storm sewer pipe was installed in the mid-1990s to mitigate tar migration to the river. *See* Shifrin Testimony at 72 and related exhibits.

322. The most extensive tar contamination occurs in the southern third of the site, where DNAPL was observed seeping into the river through the retaining wall. Smaller areas of contamination occur near the former tar tanks and gas holders No. 1, 2, and 3. Some site contamination is attributable to gas holder No. 3 – which was operated and inspected by UGI. Also, during UGI's tenure a CL&P investigation recommended discontinuing tar emulsion formation practices (i.e., steam discharges to Gas Holder No. 3). *See* Shifrin Testimony at 72 and related exhibits.

323. Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure. Some of this equipment had tar in it and/or was designed to handle wastes or byproducts. *See* Shifrin Testimony at 73 and related exhibits; Exhibit 26.

324. There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin. *See* Shifrin Testimony at 73 and related exhibits (listing specific facts demonstrating control); Blake Testimony at 55-56 (listing specific facts demonstrating control).

325. The contamination at this site correlates with the UGI-controlled equipment. *See* Shifrin Testimony at 73; Exhibit 27.

326. UGI operated the Willimantic MGP site from 1930 to 1941. *See* Shifrin Testimony at 73 and related exhibits; Blake Testimony at 56-57.

**UGI's Control of the Putnam MGP**

327.    CWG production began at the Putnam site in 1878.  CWG production ended and a majority of the equipment was dismantled in 1953.  The facility's relief holder was demolished in 1964.  *See* Shifrin Testimony at 74 and related exhibits.

328.    This plant made 1.6 billion cubic feet of gas (43% under UGI) from 1878 to 1953.  The plant also made 0.8 million gallons of tar byproduct (43% under UGI).  *See* Shifrin Testimony at 74 and related exhibits.

329.    The Putnam Light and Power Company was acquired by the Eastern Connecticut Power Company ("ECPC") in 1922.  The ECPC "passed into the control of The Connecticut Electric Service Company" on February 18, 1926.  On May 28, 1929, the ECPC (along with Putnam) was merged into CL&P.  UGI controlled the site from 1926-1941.  *See* Blake Testimony at 20 and related exhibits.

330.    The location of this site is north of Arch Street and Kennedy Memorial Drive in Putnam, Connecticut.   The Quinebaug River flows to the east approximately 100 feet south of the site.  The 1.2 acre site slopes southeast toward Arch St. with groundwater approximately 20 feet below ground surface flowing southwest toward the Quinebaug River in fine sands, silt, and clay with no continuous confining layer.  Bedrock is approximately 49 feet below ground surface.  Coal tar deposits, are on average less than 3 feet thick located within the upper 25 feet of soil, and cover approximately 170 square yards.  Soil borings indicate that NAPL was released from Gas Holders No. 1, 2, and 3 and near the northern tar well. LNAPL observed in wells in the southwest corner of site indicates possible groundwater contamination.  "Creosote" was observed during well drilling at the bedrock interface, although no specific location was described.  Coal tar was observed in Simonzi park (west of site).  VOCs were detected in groundwater at the

southern corner of the site, but no impact was observed in the surface water.  No known remedies have been completed. *See* Shifrin Testimony at 74-75 and related exhibits.

331.    Coal tar constituents observed on site and off-site are related to tar ponds and two tar wells which were used throughout plant operations for disposal of waste tar when refining was not feasible.  The tar wells had pipes leading to the Quinebaug River to drain the tar.  No information is available to define the years in which the tar wells were used.  In 1953, when production ceased, the tar ponds were covered with soil, but no information is available about tar that remained in the tar wells. *See* Shifrin Testimony at 75 and related exhibits.

332.    Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure.  Some of this equipment had tar in it and/or was designed to handle wastes or byproducts. *See* Shifrin Testimony at 75 and related exhibits; Exhibit 28.

333.    There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin. *See* Shifrin Testimony at 75-76 and related exhibits (listing specific facts demonstrating control); Blake Testimony at 53-54 (listing specific facts demonstrating control).

334.    The contamination at this site correlates with the UGI-controlled equipment. *See* Shifrin Testimony at 76; Exhibit 29.

335.    UGI operated the Putnam MGP site from 1926 to 1941. *See* Shifrin Testimony at 76 and related exhibits; Blake Testimony at 56-57.

### UGI's Control of the Bristol MGP

336.    CWG production at this site began in 1905.  CWG production ended in 1928 and the holders were then used for storage.   Demolition occurred between 1928 and 1968.  In 1969 gas holders no. 3 and 4 were dismantled. *See* Shifrin Testimony at 76 and related exhibits.

337.    This plant made 2.4 billion cubic feet of gas (20% under UGI) from 1905 to 1928. The plant also made 1.4 million gallons of tar byproduct (23% under UGI). *See* Shifrin Testimony at 76 and related exhibits.

338.    The Syndicate acquired the stock of the Bristol and Plainville Electric Company, which it then sold to the Connecticut Electric Service Company in 1927. The Bristol and Plainville Electric Company was merged into CL&P in 1927. *See* Blake Testimony at 20 and related exhibits.

339.    UGI controlled the Bristol MGP through CL&P from 1927 to 1941. *See* Shifrin Testimony at 77 and related exhibits.

340.    On November 3, 1925, The *Bristol Press* ran a story describing the purchase of The Bristol & Plainville Electric Company by CL&P and further reporting that "[t]he Connecticut Light and Power Company controlled by the United Gas Improvement Company of Philadelphia, within the last year has taken over the Meriden Gas Company . . . this latest purchase being in line with the general consolidation of plants throughout the state under one control." *See* Blake Testimony at 45 and related exhibits.

341.    This site is located next to Route 72 in Bristol, Connecticut and is 2.5 acres. The Pequabuck River is 150 feet to the south of this land. The site slopes southwest to the Pequabuck River with groundwater 1 to 10 feet below ground surface flowing toward the river in fill, alluvial deposits, and glaciofluvial deposits with no confining layer. Bedrock outcrops on the west side of the site with depth to bedrock increasing to the east and south. *See* Shifrin Testimony at 77 and related exhibits.

342.    The largest tar deposit, as indicated by "coal tar" recorded in boring logs and high TarGOST readings, is located in the central portion of the site along the fence line south of the

workshop and west of Gas Holder No. 2 with tar from 5 to 10 feet below ground surface. TarGOST readings indicate that tar migration is south toward the river. Near the fence line, tar was observed at least 4 feet into fractured bedrock. TarGOST readings indicate tar contamination south of the fuel tanks, migrating south toward the river, and also between Gas Holders No. 3 and No. 1. Groundwater at downgradient boundaries has tar constituents such as total PAHs as high as 480 µg/L and naphthalene as high as 345 µg/L. *See* Shifrin Testimony at 77 and related exhibits.

343. All of the MGP structures were intact when UGI control began in 1927; UGI apparently left tar in MGP structures after operations stopped. MGP structures left intact for an unknown period of time between the end of production in 1928 and 1969 resulted in tar releases. Holders No. 3 and 4 remained onsite until 1969, and the 2007 investigation found that numerous subsurface MGP structures remain today including three drip pots and foundations/walls of gas relief holders, buildings, and subsurface pipes. Contamination on site is related to tar residue, MGP fuel oil tanks, and gas Holders No. 1, 3, and 4. *See* Shifrin Testimony at 77-78 and related exhibits.

344. Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure. Some of this equipment had tar in it and/or was designed to handle wastes or byproducts. *See* Shifrin Testimony at 78 and related exhibits; Exhibit 30.

345. There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin. *See* Shifrin Testimony at 78 and related exhibits (listing specific facts demonstrating control); Blake Testimony at 52-53 and related exhibits (listing specific facts demonstrating control).

346.    The contamination at this site correlates with the UGI-controlled equipment.  *See* Shifrin Testimony at 78; Exhibit 31.

347.    UGI operated the Bristol MGP site from 1927 to 1941.  *See* Shifrin Testimony at 78 and related exhibits: Blake Testimony at 56-57.

### UGI's Control of the Middletown MGP

348.    Gas production began in 1853, although it is unknown what kind of gas was produced.  The CWG process was used at the facility starting in 1886.  CWG gas production ended in 1928.  The facility was used to store and distribute gas from Connecticut Coke Works beginning in 1929.  Gas storage ended and the last waterseal gas holder was removed in 1955.  *See* Shifrin Testimony at 79 and related exhibits.

349.    The plant made 2.3 billion cubic feet of gas (8% under UGI) from 1853 to 1928 and 1.2 million gallons of tar (8% under UGI).  *See* Shifrin Testimony at 79 and related exhibits.

350.    UGI acquired all the outstanding shares of the Middletown Gas Light Company through the Service Company in 1927.  The stock was previously held by "independent and unrelated stockholders."  Subsequently, Middletown was merged into CL&P in 1927.  *See* Blake Testimony at 20 and related exhibits; Macey Testimony at 28.

*351*.    UGI controlled the Middletown MGP through CL&P from 1927 to 1941.  *See* Shifrin Testimony at 79 and related exhibits.

352.    This site is located at DeKoven Drive in Middletown, Connecticut and is approximately 0.4 acres.   The site is located on the western floodplain of the Connecticut River near Sumner Brook.  The 0.4 acre site is nearly flat with groundwater at 8 to 10 feet below ground surface flowing both east and west from an apparent divide in the central portion of the site.  The site is underlain by fill, sand, gravel, silt, and clay.  The silt and clay layer, at 15 to 20

feet below ground surface, may act as a confining layer, and bedrock is estimated to be 50 feet below ground surface. NAPL was observed in 10 of 12 borings on site. "Coal tar or coal tar related compounds" were observed near the former generators, and at the southeast edge of Gas Holder No. 4. Contaminated groundwater at downgradient boundaries has tar constituents such as total PAHs as high as 6,750 μg/L and naphthalene as high as 2,700 μg/L. *See* Shifrin Testimony at 79 and related exhibits.

353.    Various pieces of gas making and/or tar handling equipment were installed and or used during UGI's tenure. Some of this equipment had tar in it and/or was designed to handle wastes or byproducts. *See* Shifrin Testimony at 79 and related exhibits; Exhibit 32.

354.    There are numerous specific examples of UGI control provided in the testimony of Thomas Blake and Dr. Neil Shifrin. *See* Shifrin Testimony at 80 and related exhibits (listing specific facts demonstrating control); Blake Testimony at 54 and related exhibits (listing specific facts demonstrating control).

355.    The contamination at this site correlates with the UGI-controlled equipment. *See* Shifrin Testimony at 80 and related exhibits; Exhibit 33.

356.    UGI operated the Middletown MGP 1927 to 1941. *See* Shifrin Testimony at 80 and related exhibits; Blake Testimony at 56-57.

**Proposed Rulings of Law**

1.  Yankee Gas Services Company is the current owner of the former MGPs in Bristol, Middletown, Waterbury South, Meriden (Cooper Street), Norwalk, Putnam, Waterbury North and Willimantic.

2.  CL&P is the current owner of the Rockville and Winsted (Gay Street) former MGPs at issue in this case.

3.  The Plaintiffs have contingent liabilities for the Waterbury (Benedict Street), Winsted (Prospect Street) and Meriden (South Colony Street) MGPs because their corporate and legal predecessors owned these sites.

4.  United Gas Improvement Company is the corporate and legal predecessors of Defendant, UGI Utilities, Inc.

5.  The United Gas Improvement Company is the corporate and legal predecessor of Defendant, UGI Utilities, Inc.

6.  Section 107(a) of CERCLA permits potentially responsible parties to recover response costs from former owners and/or operators of facilities. *See* 42 U.S.C. § 9607(a).

7.  The Plaintiffs § 107(a) claims are timely filed. *See* 42 U.S.C. § 9613(g)(2).

8.  In relevant part, § 107 provides that "any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of," shall be liable for "any other necessary costs of response incurred by ***any other person*** consistent with the national contingency plan." *Id* (emphasis added).

9.  UGI is a "person" as defined by CERCLA, 42 U.S.C. § 9601(21).

10. Yankee Gas Services Company is a "person" as defined by CERCLA, 42 U.S.C. § 9601(21).

11. Hazardous substances were released and/or disposed of at the Connecticut MGPs within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

12. The Connecticut Light and Power Company is a "person" as defined by CERCLA, 42 U.S.C. § 9601(21).

13. The controlling precedent for corporate predecessor liability under CERCLA is *U.S. v. Bestfoods,* 524 U.S. 51 (1998).

14. *Bestfoods* established that Plaintiffs may seek liability of a parent corporation under two distinct theories:

      A.   Direct liability where the parent operates the facility; and

      B.   Derivative liability where the corporate veil may be pierced.

15. The Plaintiffs § 107(a) claims for response costs are timely filed pursuant to CERCLA's statute of limitations as set forth in 42 U.S.C. § 113

### *Operator Liability*

16. CERCLA § 107(a) provides that an "operator" of a facility is directly liable for response costs incurred investigating, remediating and monitoring a facility.

17. Prior to *Bestfoods*, courts were unclear about what degree of control by a parent corporation over a subsidiary would give rise to CERCLA liability.  The *Bestfoods* Court addressed that issue:

> So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.  To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods*, 524 U.S. at 66-67.

18. "If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability."  *Bestfoods*, 524 U.S. at 65 (citing *Riverside Market Dev. Corp. v. International Bldg. Prods., Inc.*, 931 F.2d 327 (5th Cir. 1991)).

19. The Supreme Court described three scenarios where a parent corporation might be held liable as an operator of its subsidiary facility.  (1) "[T]he parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture;" (2) if a "dual officer or director [departs] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility;" or (3) "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Bestfoods*, 524 U.S. at 71.

20. UGI managed, directed and/or conducted operations specifically related to pollution at each of the thirteen Connecticut MGPs.

### Waterbury North

21. The Waterbury North MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

22. Hazardous substances were released and/or disposed of at the Waterbury North MGP between 1884 and 1914 and 1929-1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

23. UGI "operated" the Waterbury North MGP from 1884 to 1914 and 1929-1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a).  *See Bestfoods*, 524 U.S. 51 (1988); *United States v. Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Waterbury South

24. The Waterbury South MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

25. Hazardous substances were released and/or disposed of at the Waterbury South MGP between 1929 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

26. UGI "operated" the Waterbury South MGP from 1929 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### *Waterbury Benedict Street*

27. The Waterbury Benedict Street MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

28. Hazardous substances were released and/or disposed of at the Waterbury Benedict Street MGP between 1884 and 1914 and 1929-1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

29. UGI "operated" the Waterbury Benedict Street MGP from 1884 and c.1895 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### *Norwalk*

30. The Norwalk MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

31. Hazardous substances were released and/or disposed of at the Norwalk MGP between 1899 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

32. UGI "operated" the Norwalk MGP from 1899 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Meriden Cooper Street

33. The Meriden Cooper Street MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

34. Hazardous substances were released and/or disposed of at the Meriden Cooper Street MGP between 1924 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

35. UGI "operated" the Meriden Cooper Street MGP from 1924 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Meriden South Colony Street

36. The Meriden South Colony Street MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

37. Hazardous substances were released and/or disposed of at the Meriden South Colony Street MGP between 1924 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

38. UGI "operated" the Meriden South Colony Street MGP from 1924 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Winsted Gay Street

39. The Winsted Gay Street MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

40. Hazardous substances were released and/or disposed of at the Winsted Gay Street MGP between 1929 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

41. UGI "operated" the Winsted Gay Street MGP from 1929 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Winsted Prospect Street

42. The Winsted Prospect Street MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

43. Hazardous substances were released and/or disposed of at the Winsted Prospect Street MGP between 1929 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

44. UGI "operated" the Winsted Prospect Street MGP from 1929 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Rockville

45. The Rockville MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

46. Hazardous substances were released and/or disposed of at the Rockville MGP between 1930 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

47. UGI "operated" the Rockville MGP from 1930 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Willimantic

48. The Willimantic MGP is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

49. Hazardous substances were released and/or disposed of at the Willimantic MGP between 1930 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

50. UGI "operated" the Willimantic MGP from 1930 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### Putnam

51. The Putnam MGP is a "facility" within the meaning of CERCLA, 42 U.S.C.

§ 9601(9).

52. Hazardous substances were released and/or disposed of at the Putnam MGP between

1926 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

53. UGI "operated" the Putnam MGP from 1926 to 1941 within the meaning of

CERCLA, 42 U.S.C. § 9607(a).  *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89

(1st Cir. 2002).

### Bristol

54. The Bristol MGP is a "facility" within the meaning of CERCLA, 42 U.S.C.

§ 9601(9).

55. Hazardous substances were released and/or disposed of at the Bristol MGP between

1927 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

56. UGI "operated" the Bristol MGP from 1927 to 1941 within the meaning of CERCLA,

42 U.S.C. § 9607(a).  *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir.

2002).

### Middletown

57. The Middletown MGP is a "facility" within the meaning of CERCLA, 42 U.S.C.

§ 9601(9).

58. Hazardous substances were released and/or disposed of at the Middletown MGP

between 1927 and 1941 within the meaning of CERCLA, 42 U.S.C. 9601(14) and (22).

59. UGI "operated" the Middletown MGP from 1927 to 1941 within the meaning of CERCLA, 42 U.S.C. § 9607(a). *Bestfoods*, 524 U.S. 51 (1988); *Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2002).

### *Derivative Ownership Liability – Veil Piercing*

60. CERCLA § 107(a) provides that an "operator" of a facility is directly liable for response costs incurred investigating, remediating and monitoring a facility.

61. "[T]he corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *U.S. v. Bestfoods*, 524 U.S. 51, 62 (1998).

62. The *Bestfoods* Court declined to decide whether federal common law or state law applies to cases of piercing the corporate veil under CERCLA. *Id.* at 64 n.9 ("There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing…. [T]he question is not presented in this case, and we do not address it further.").

63. Lower courts are split as to what law to apply. Courts determining that federal common law is appropriate have reasoned that "the strong federal interest in uniform enforcement of environmental legislation set forth by Congress [and] the very real risk that the application of state laws would frustrate the objectives of the federal program … warrants [sic] the development of a uniform federal rule applicable to alter ego claims under CERCLA." *Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 202–03 (E.D.N.Y. 1997) (quoting *U.S. v. Nicolet, Inc.,* 712 F. Supp. 1193, 1201–03 (E.D. Pa. 1989)); *see also Idylwoods Associates v. Madar Capital, Inc.*, 915 F. Supp. 1290, 1305 (W.D.N.Y. 1996) ("Whether or not a

corporation is liable under corporate veil-piercing standards should be analyzed under federal common law, since 'it is well established that when a federal statute is silent as to the choice of law to be applied, but overriding federal interests exist, courts should fashion uniform federal rules of decision.'"); *City of New York v. Exxon Corp.*, 112 B.R. 540, 552–53 (S.D.N.Y. 1990), *aff'd in part*, 932 F.2d 1020 (2d Cir. 1991); *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1225 (3rd Cir. 1993).

64. Other courts, however, have found that state law should be the determining law in alter ego claims under CERCLA. *See, e.g., Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 746–47 n.1 (6th Cir. 2001) (finding that the outcome of the issue would be the same under both federal common law and state law, the court applies Ohio law to a veil piercing claim under CERCLA). Still other courts argue that "the choice between state and federal [veil-piercing law] may in many cases present questions of academic interest, but little practical significance," because "federal common law draws upon state law for guidance." *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 33 (D. Mass. 1987).

65. Although several district courts in New York have chosen to apply federal common law in these situations, *see, e.g., Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 198–200 (E.D.N.Y. 1997), the Second Circuit Court of Appeals has not yet adopted one view over another.

66. In *New York v. National Service Industries*, the Second Circuit specifically declined to decide "whether federal common law for purposes of determining corporate successor liability under CERCLA incorporates state law…or displaces state law in favor of a uniform national rule derived from traditional common-law principles." *New York v. National Service Industries,* 460 F. 3d 201, 203 (2d Cir. 2006). The court reasoned that the appellant's claim would fail under

either state or federal common law. *Id.* Although the case deals with corporate successor liability under CERCLA instead of alter ego liability, it demonstrates the court's unwillingness to decide between state and federal common law for claims of liability under CERCLA if the final outcome would prove to be the same under either.

67. CL&P's corporate veil should be pierced and UGI should be deemed an owner of the thirteen Connecticut MGPs under either Federal or Connecticut veil piercing law.

### *Federal Law*

68. Under federal veil piercing law, no one factor is required for a finding that it is appropriate to pierce the corporate veil. *Idylwoods Assocs. v. Madar Capital, Inc.*, 95 F.Supp. 1290, 1305 (W.D.N.Y. 1996).

69. Further, "[t]he equitable decision to pierce the veil is dependent on the facts peculiar to each case." *Id.*

70. Federal courts consider the following factors as a guideline in making the decision to pierce the corporate veil:

> (1) inadequate capitalization in light of the purposes for which the corporation was organized; (2) extensive or pervasive control by the shareholder or shareholders; (3) intermingling of the corporation's properties or accounts with those of its owner; (4) failure to observe corporate formalities and separateness; (5) siphoning of funds from the corporation; (6) absence of corporate records; and (7) nonfunctioning officers or directors.

*Idylwoods*, 95 F.Supp. at 1305.

71. Piercing CL&P's corporate veil is appropriate because UGI (1) inadequately capitalized CL&P;  (2) exercised extensive and/or pervasive control over CL&P; (3) intermingled CL&P's properties and/or accounts with those of UGI; (4) failed to observe

corporate formalities; (5) siphoned funds from CL&P; (6) did not keep accurate corporate

records for CL&P; and (7) placed nonfunctioning officers and directors on CL&P's board.

### Connecticut Law

72. Under Connecticut law, "[w]hen the statutory privilege of doing business in the

corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to

do injustice, or invoked to subvert equity, the separate personality of the corporation will be

disregarded." *Toshiba America Medical Systems v. Mobile Medical System*, 53 Conn.App. 484,

494 (1999) (internal quotations omitted) (quoting *United Electrical Contractors, Inc. v. Progress

Builders, Inc.*, 26 Conn.App. 749, 755 (1992)).

73. Connecticut courts will therefore "disregard the fiction of a separate legal entity to

pierce the shield of immunity afforded by the corporate structure in a situation in which the

corporate entity, has been so controlled and dominated that justice required liability to be

imposed on the real actor." *Tomasso v. Armor Construction & Paving, Inc.*, 187 Conn. 544, 553

(1982).

74. Connecticut courts use two tests to determine whether piercing the corporate veil is

appropriate:  (1) the instrumentality rule and (2) the identity rule.

75. The instrumentality rule requires proof of the following three elements

> (1) Control, not mere majority or complete stock control, but complete
> domination, not only of finances but that of policy and business practice in respect
> to the transaction attacked so that the corporate entity as to this transaction had at
> the time no separate mind, will or existence of its own; (2) that such control must
> have been used by the defendant to commit fraud or wrong, to perpetrate the
> violation of a statutory or other positive legal duty, or a dishonest or unjust act in
> contravention of plaintiff's legal rights; and (3) that the aforesaid control and
> breach of duty must proximately cause the injury or unjust loss complained of.

*Tomasso*, 187 Conn. at 553.

76. Under the instrumentality rule, the Plaintiffs have presented evidence that the corporate veil should be pierced because it is more probable than not that UGI's completely dominated CL&P for its own benefit and that UGI hid its actual control over CL&P. This domination and deception harmed CL&P.

77. The identity rule is satisfied when the plaintiff

> can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction or separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole.

*Tomasso*, 187 Conn. at 554.

78. Under the identity rule, the Plaintiffs have established that it is more probable than not that there was a unity of interest and ownership between UGI and CL&P, such that the separate entities were indeed a fiction.

79. UGI not only pervasively and systematically dominated the operations of the CL&P, but it did so in a manner crafted and calculated to mislead the public and regulators regarding its control. Moreover, its manipulation of the corporate form was for its own purpose and denied the subsidiaries any independent opportunity to run and manage their own business. This course of conduct was clearly unfair and promoted injustice. It was also dishonest, because creating the appearance of local involvement and control was a pure fiction and designed to prevent or delay regulation and ultimately divestiture of UGI's monopolistic control.

80. In accordance with 28 U.S.C § 2201, because the Defendant is a former owner and/or operator of the thirteen Connecticut MGPs, the Plaintiffs are entitled to a declaration that UGI is liable for response costs incurred by the Plaintiffs investigating, remediating and monitoring the thirteen Connecticut MGPs.

Respectfully submitted,

YANKEE GAS SERVICES COMPANY AND THE
CONNECTICUT LIGHT AND POWER COMPANY

By Their Attorneys,

McLANE, GRAF, RAULERSON & MIDDLETON,
  PROFESSIONAL ASSOCIATION

Date:   November 15, 2008          By:   __/s/__Bruce W. Felmly_____
                                        ___/s/ Cathryn E. Vaughn_____
                                        Bruce W. Felmly, Bar# ct21418
                                        Barry Needleman, Bar# phv01313
                                        Cathryn E. Vaughn, Bar # phv01312
                                        900 Elm Street, P.O. Box 326
                                        Manchester, New Hampshire 03105
                                        Telephone (603) 625-6464

                                        Duncan J. MacKay, Bar # ct03370
                                        Charles J. Nicol, Bar # ct09073
                                        Northeast Utilities Service Company as agent for
                                        Yankee Gas Services Company and The
                                        Connecticut Light and Power Company
                                        107 Selden Street
                                        Berlin, CT 06037
                                        Telephone (860) 665-3495

## CERTIFICATE OF SERVICE

I hereby certify that this Plaintiffs' Plaintiffs' Proposed Findings of Fact and Rulings of Law is being electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record.

                                        _/s/ Cathryn E. Vaughn_____
                                        Cathryn E. Vaughn